**MAXWELL HARDWARE COMPANY, a corporation, Petitioner on Review,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent on Review.**

No. 19372.

United States Court of Appeals
Ninth Circuit.

March 30, 1965.

Rehearing Denied May 10, 1965.

Valentine Brookes, Richard A. Wilson, George H. Koster, San Francisco, Cal., for petitioner.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Fred R. Becker, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before HAMLEY and MERRILL, Circuit Judges, and THOMPSON, District Judge.

THOMPSON, District Judge:

This is a petition for review of a decision of the Tax Court of the United States, jurisdiction of which is conferred on this Court under Title 26, U.S.C. § 7482. The Tax Court disallowed to Petitioner, Maxwell Hardware Company, a corporation, net operating loss carryover deductions taken for its tax years ending January 31, 1957 to 1960, inclusive.

In summary, the facts are that Maxwell Hardware had sustained approximately $1,000,000 of losses in a hardware business. It entered into an agreement with two partners, Beckett and Federighi, who were engaged in numerous real estate development activities as partners and controlling stockholders of corporations, whereby a real estate department was established in Maxwell Hardware to develop a subdivision, the funds therefor being furnished by the two partners through purchases of non-voting preferred stock in the corporation for an amount which was approximately two-fifths of the then value of the common stock of the corporation. The real estate department was accounted for independently of the other corporate business. The agreement provided that the real estate department should not be discontinued for a period of six years, that the preferred stockholders should not sell their stock for this period, and thereafter, if the department were discontinued at the option of either the corporation or preferred stockholders, the preferred stock should be redeemed by distribution in kind of ninety per cent of the department's assets to the preferred stockholders. A voting trust agreement was established to restrict the control of the common stockholders over the corporation for a period of five years. The voting trust agreement did not, however, transfer such control to the new investors. The hardware business was discontinued and the real estate business (Bay-O-Vista Subdivisions) operated at a profit. The net operating losses which had been previously sustained by the hardware business were deducted as loss carryovers from the real estate profits. The agreement between the corporation and the new preferred stockholders was entered into on October 18, 1954, and was therefore governed by the provisions of Internal Revenue Code of 1954.

■■ The transactions and events giving rise to this dispute are complicated and extensive. The Findings of Fact and Opinion of the Tax Court are published (Arthur T. Beckett v. Commissioner, 41 T.C. 386). Inasmuch as this decision will be of interest primarily to the tax bar, to whom the referenced publication is readily available, we see no justification in reprinting here the twelve odd pages of Findings of Fact there published. They are adopted by reference. Neither have we undertaken here to repeat in detail all the contentions and arguments discussed in the Tax Court Opinion. With one exception, the findings of the Tax Court have not been contested on this appeal. Petitioner complains that the finding that the "primary purpose of Beckett and Federighi in entering into the agreement of October 18, 1954 with Maxwell Hardware was to enable the profits which they anticipated would be made in the development of the Bay-O-Vista Subdivision to be offset by net operating losses which had been sustained by Maxwell Hardware in prior years" is contrary to the evidence. We think the finding to be amply sustained by substantial evidence and not subject to review by this Court. United States v. First Security Bank (9 CCA 1964), 334 F.2d 120, and cases there cited. Our review of the decision, therefore, is restricted to an interpretation and application of the law to the facts as found.

Preliminarily, we should note that in the Tax Court, three petitions for redetermination of deficiencies assessed by the Commissioner, involving the tax liabilities of Arthur T. Beckett and Gertrude E. Beckett, #93309, of Frederick J. Federighi and Mary Helen Federighi, #95310, and of Maxwell Hardware Company, #95311, arising out of the related transactions, were consolidated for trial on a single common fact issue. The Tax Court trial was a complete trial with respect to the tax liability of Maxwell Hardware Company, but only a partial trial with respect to the tax liability of the individuals, Becketts and Federighis. The common issue of fact consolidated for trial was whether the income of the real estate department of Maxwell Hardware Company should have been returned by Maxwell Hardware Company or by the partnership of Beckett and Federighi, and derivatively, by the partners individually. The Government contended that the transactions were a sham, and that the operation of the real estate business under the corporate cloak was pure subterfuge, without factual substance.

The Tax Court, relying upon substantial evidence, resolved this issue in favor of the bona fides of the transactions in the sense that they were not sham, that there was a genuine business purpose for using a corporation for the real estate development enterprise, and that the resulting transactions were corporate actions of Maxwell Hardware, not actions of Beckett and Federighi carried on under a corporate name. The Tax Court held that the subdivision income was properly returned as the income of Maxwell Hardware Company. This conclusion is not excepted to by either party on this appeal and constitutes the foundation for our consideration of the case.

The reported opinion and decision of the Tax Court (Judge Scott) demonstrates careful and thorough analysis of the facts, understanding of the law, and clarity of expression. We do not, however, agree with the conclusions of the Tax Court in applying the law to the established facts.

## APPLICABILITY OF THE LIBSON SHOPS DOCTRINE

The Tax Court relied upon the decision of the Supreme Court in Libson Shops, Inc. v. Koehler, 1957, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924. In that case, the transactions generating the tax liability occurred prior to the effective date of the 1954 Code. The issue there was "whether under §§ 23(s) and 122 of the Internal Revenue Code of 1939, as amended, a corporation resulting from a merger of 17 separate incorporated businesses, which had filed separate income tax returns, may carry over and deduct the pre-merger net operating losses of three of its constituent corporations from the

post-merger income attributable to the other businesses." (Idem. 382, 77 S.Ct. 990). The Supreme Court denied the loss carryover deduction, saying: "We conclude that petitioner is not entitled to a carry-over since the income against which the offset is claimed was not produced by substantially the same businesses which incurred the losses." (Idem. 390, 77 S.Ct. 994). The Commissioner, the Tax Court and Petitioner all agree that if Libson Shops had arisen under the 1954 Code, the same decision could not have been made inasmuch as Section 381 of the 1954 Code would expressly allow the net operating loss carryover and the limitations of Section 382 would be inapplicable.

 Whenever a Court adopts a rule of decision to sustain a conclusion, interpreting statutory law then applicable, and the legislative authority amends or changes the statutory law to the effect that the same decision could not be reach-

ed if the new statute were applied to the same facts, the case is not controlling precedent for judicial interpretation of the new law.[1] By enacting the 1954 Code, Congress destroyed the precedential value of the rule of decision of Libson Shops; that is, that for a loss carryover deduction to be allowed, the income against which the offset was claimed must have been produced by substantially the same businesses which incurred the losses. This is not now the law. It seems to us irrelevant that Libson Shops was decided in 1957, long after the enactment of the 1954 Code. The Supreme Court, in Libson Shops, decided the case by deliberately interpreting and applying the Internal Revenue Code of 1939, as amended, and, while noting a minor change in the 1954 Code (Idem. 385, 77 S.Ct. 992, footnote 2), did not comment upon or consider how the case should be decided if the 1954 Code were applicable.[1a]

1. While we have found no enunciation of the principle of stare decisis in this exact language in the authorities, we think the statement is necessarily implied. 21 C.J.S. Courts § 191, p. 318: "Where the law on a particular subject is radically changed or superseded by statute, decisions under the old law become of little value as authority." Helvering v. Hallock, 1940, 309 U.S. 106, 60 S.Ct. 444, 84 L.Ed. 604: "But stare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision * * *." Great Northern Ry. Co. v. United States, 1942, 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836 (overruling the interpretation in the Stringham case of an 1875 Act of Congress): "The conclusion that the railroad was the owner of a 'limited fee' was based on cases arising under the land grant acts passed prior to 1871, and it does not appear that Congress' change of policy after 1871 was brought to the Court's attention. That conclusion is inconsistent with the language of the Act, its legislative history, its early administrative interpretation and the construction placed on it by Congress in subsequent legislation. We therefore do not regard it as controlling." Helvering v. Griffiths, 1942, 318 U.S. 371, 63 S.Ct. 636, 87 L.Ed. 843 (where the Court was asked to overrule

Eisner v. McComber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521): "Nothing in the history or attitude of this Court should give rise to legislative embarrassment if in the performance of its duty a legislative body feels impelled to enact laws which may require the Court to re-examine its previous judgments or doctrine. The Court differs, however, from other branches of the Government in its ability to extricate itself from error. It can reconsider a matter only when it is again properly brought before it in a case or controversy; *and if the case requires, as a tax case does, a statutory basis for a case, the new case must have sufficient statutory support.*" Patterson v. United States, 1959, 359 U.S. 495, 79 S.Ct. 936, 3 L.Ed.2d 971: " '[W]hen the questions are of statutory construction, not of constitutional import, Congress can rectify our mistake, if such it was, *or change its policy at any time * * *.* '" (Emphasis supplied.)

1a. In Sansone v. United States, 85 S.Ct. 1004, decided March 29, 1965, the Supreme Court, held its decision in Achilli v. United States, 1957, 353 U.S. 373, 77 S. Ct. 995, 1 L.Ed.2d 918, under the 1939 Code to be inapplicable to the same problem arising under the new treatment in the 1954 Code.

## SECTIONS 172 and 382 LIMITATIONS

■ Recognizing the frailty of Libson Shops as a precedent for decision in this case, the Government suggests alternative bases to sustain the Tax Court. One is the contention that Section 172,[2] which establishes the net operating loss carryover deduction does not apply to Maxwell Hardware. The argument is that, viewed realistically, the transactions amounted to placing "two separately owned business entities under a single corporate roof", and that the net operating loss carryover deduction inures only to the business entity which generated it. As a matter of statutory interpretation, we find nothing in § 172 which justifies such a conclusion. We cannot disregard the finding of the Tax Court that Maxwell Hardware Company, a corporation, is the taxable entity in this case and that it is the entity which suffered the losses as well as generated the subsequent income sought to be taxed. The corporation is the "taxpayer" as defined in the Code [26 U.S.C., § 1313(b), § 7701(a) (14), and we see no justification for a judicial departure from the carefully devised and integrated concepts of the Code which would require a judicial recognition of a taxable entity or "taxpayer" different from those identified by Congress.

With respect to the limitations applicable to the deductibility of net operating loss carryovers, the Government says that the deduction is disqualified in this case by the special limitation provisions of Section 382(a).[3]

■■ The Tax Court found Section 382(a) to be inapplicable, and we agree. The conditions of subsection (C) have been fulfilled, i. e., Maxwell Hardware did not continue to "carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value" of the stock. It is also clear, however, that these complicated transactions did not result in persons, as defined, owning fifty percentage points more of the total fair market value of the outstanding stock of such corporation than theretofore. The Tax Court found that the stock acquired by Beckett and Federighi was "nonvoting stock which is limited and preferred as to dividends" [26 U.S.C. § 382(c)], and said: "It is clear that the

2. § 172(a): "There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. For purposes of this subtitle, the term 'net operating loss deduction' means the deduction allowed by this subsection."

3. § 382(a) (1): "Purchase of a corporation and change in its trade or business.—
"In General.—If, at the end of a taxable year of a corporation.—
"(A) any one or more of those persons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percentage points more than such person or persons owned at—
"(i) the beginning of such taxable year, or
"(ii) the beginning of the prior taxable year,
"(B) the increase in percentage points at the end of such taxable year is attributable to—

"(i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or
"(ii) a decrease in the amount of such stock outstanding or the amount of stock outstanding of another corporation owning stock in such corporation, except a decrease resulting from a redemption to pay death taxes to which section 303 applies, and
"(C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock,
the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years."

issuance of the preferred stock to Beckett and Federighi does not come within any of these provisions." (T.C. 417). Its concise statement of the problem remaining is (T.C. 417): "The problem is whether by specifying the various circumstances in section 382 in which net operating loss deductions would be disallowed in whole or in part where a change in stock ownership has occurred followed by a change in corporate business, Congress intended to provide that in all other instances the loss corporation would be entitled to deduct its net operating loss carryover from earnings from a different business enterprise unless such deduction fell within the prohibition of section 269." We disagree with the Tax Court's negative answer to this inquiry. We conclude from the legislative history that it was the clearly expressed intention of Congress to attempt to bring some order out of chaos, and, in effect, to countenance "trafficking" in operating loss carryovers except as affected by the special limitations of Section 382 and the general limitations of Section 381. (Other Code sections, such as Section 269, are disregarded in this discussion and will be hereinafter considered separately).

By adopting Section 172(a), Congress created a net operating loss deduction, applicable to taxpayers generally. In Section 381, Congress dealt specifically with the transfer of a variety of deductions, including net operating loss carryovers [Sec. 381(c) (1)] in cases of corporate reorganizations and acquisitions;

and in Section 382, Congress provided special limitations by careful and specific definition upon the right to take a net operating loss carryover deduction where there had been a change in ownership of the corporate stock and a change in the corporation's trade or business. Section 172 is a substantial revision of Section 122 of the 1939 Code. U.S.Cong. & Adm. News, 1954, Vol. 3, p. 4192 (House Report), p. 4847 (Senate Report). Sections 381 and 382 are entirely new, and had no counterpart in the 1939 Code. Idem. pp. 4273, 4281 (House Report); pp. 4914, 4922 (Senate Report). We cannot ascribe to a Congress which, after years of thorough and careful committee consideration aided by the solicited advice of the finest students of taxation, has adopted a fully integrated revenue code, the intention that its provisions should be lightly disregarded by the courts. Neither can we conclude that new and unanticipable judge-made rules are contemplated by a Congress which declares: "As a result, present practice rests on *court-made law* which is *uncertain* and frequently *contradictory*. Moreover, whether or not the carryover is allowed should be based upon economic realities rather than upon such artificialities as the legal form of the reorganization" (emphasis added), Idem. p. 4066 (House Report), p. 4683 (Senate Report). The Reports respecting Section 382 even more clearly demonstrate Congressional intent to substitute statutory rules for judge-made law.[4] It is quite unlikely that the

4. House Report, p. 4067:
"Under present law where a controlling interest in a corporation is acquired for the purpose of avoiding or evading tax liabilities the Internal Revenue Service may disallow the benefits of a deduction, credit, or allowance which would otherwise be enjoyed by the acquiring person or corporation. This provision has proved ineffectual, however, because of the necessity of proving that tax avoidance was the primary purpose of the transaction. It has also been so *uncertain* in its effects as to *place a premium on litigation* and a *damper on valid business transatcicns.*

"The committee added a provision designed to limit undue tax benefits of this character by restricting the amount of net operating loss carryover which may be deducted where 50 percent or more of the participating interest in a corporation was acquired by new owners. In such cases the net operating loss carryover to the current and subsequent taxable years is to be reduced by the percentage of new ownership acquired either by purchase or by decrease in the participating stock outstanding. This provision does not apply to publicly held corporations.

stated purposes of certainty, consistency and objectivity are to be achieved if each court considering a loss carryover problem adds a gloss of judicial exceptions reflecting what a particular judge or group of judges thinks Congress should have done, rather than what it did. An expression like "trafficking in loss carryovers" is a question-begging epithet which clouds reason. A dispassionate consideration of the 1954 Code must lead to the conclusion, we believe, that Congress has deliberately sanctioned such so-called "trafficking" in those situations where it is not expressly abjured.

This is not to say that the language of the 1954 Code is to be given a sterile, mechanical, literal application. The courts must give sense and vitality to that language, but this must be done within the framework of the Code to achieve the Congressional design.

## APPLICABILITY OF SECTION 269

■ As a second alternate basis for affirmance, the Government invokes the applicability of Title 26, U.S.C. § 269.[5]

"This special limitation on net operating loss carryovers *provides an objective standard* governing the availability of a major tax benefit which has been abused through trafficking in corporations with operating loss carryovers, the tax benefits of which are exploited by persons other than those who incurred the loss. It treats a business which experiences a substantial change in its ownership, to the extent of such change, as a *new entity* for tax purposes." (Emphasis added.)
Senate Report, p. 4684:
"Your committee has adopted a provision to limit the application of this provision relating to purchase to those areas in which abuse has most often arisen, that is, the purchase of the stock of a corporation with a history of losses for the purpose of using its loss carryovers to offset gains of a business unrelated to that which produced the losses. Accordingly, your committee has provided that if more than 50 percent of the stock of a corporation is purchased within a 2-year period and if the corporation thereafter engages in a different type of business, then the loss carryover is eliminated."

5. Title 26. U.S.C. § 269:
"Acquisitions made to evade or avoid income tax
"(a) In general.—If—
"(1) Any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or
"(2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation,
and the principal purpose of which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.
"(b) Power of Secretary or his delegate to allow deduction, etc., in part.—In any case to which subsection (a) applies the Secretary or his delegate is authorized—
"(1) to allow as a deduction, credit, or allowance any part of any amount disallowed by such subsection, if he determines that such allowance will not result in the evasion or avoidance of Federal income tax for which the acquisition was made; or
"(2) to distribute, apportion, or allocate gross income, and distribute, apportion, or allocate the deductions, credits, or allowances the benefit of which was sought to be secured, between or among the corporations, or properties, or parts thereof, involved, and to allow such deductions, credits, or allowances so distributed, apportioned, or allocated, but to give effect to such allowance only to such extent as he determined will not result in the evasion or avoidance of Federal income tax for which the acquisition was made; or

"(3) to exercise his powers in part under paragraph (1) and in part under paragraph (2).
"(c) Presumption in case of disproportionate purchase price.—The fact that

Subsections (a) and (b) of this Section were carried forward from Section 129 of the 1939 Code. Subsection (c), providing a presumption of wrongful purpose in certain circumstances was added by the 1954 Code. U.S.Cong. & Adm. News, 1954, Vol. 3, p. 4057 (House Report). The new presumption is of no interest here as the Tax Court found that the Maxwell Hardware acquisition by Beckett and Federighi was made for the avoidance of Federal income tax by securing the benefit of the net operating loss deduction. Just as Section 382(a) requires more than proof of a substantial change in the trade or business conducted to disqualify the deduction, so does Section 269 require more than proof of a purpose to evade or avoid taxes. The additional requirement is the acquisition directly or indirectly of control of a corporation, specifically, the ownership of stock possessing at least fifty per cent of the voting power or at least fifty per cent of the total value of shares of all classes. The purchase by Beckett and Federighi of preferred shares for $200,000 of a corporation whose common shares were found to have a fair market value of $500,000 on its face did not satisfy the requirement of acquisition of fifty per cent of the total value of the shares outstanding, and there is nothing in this record which would justify a conclusion that the true fair value of the preferred shares at the date of acquisition exceeded the amount paid therefor.

Invoking Section 269, the Government argues that the complex transaction between Maxwell Hardware and Beckett and Federighi, viewed realistically, resulted in the indirect acquisition by Beckett and Federighi of fifty per cent of the total combined voting power of the cor-poration. An integral component of the entire transaction was the voting trust agreement which, although not mentioned in the basic agreement of October 18, 1954, bore even date therewith. The agreement created an irrevocable voting trust of all the common shares of Maxwell Hardware until January 31, 1961 and invested the trustee, The San Francisco Bank, with all voting rights, limiting its authority only in respect of the selection of the Board of Directors. The agreement required the trustee to vote for T. P. Coates, an officer of the Bank, and John M. Bryan, as two members of the three man board. The trustee's selection of the third member was unfettered. The agreement accomplished a relinquishment by the common stockholders of their voting control; but the condition for the invoking of Section 269 is the acquisition by persons (here, Beckett and Federighi) of fifty per cent voting control. This is an integrated voting trust agreement which controlled the trustee's powers and responsibilities. It cannot fairly be construed as an acquisition by Beckett and Federighi of any voting control.

True, the evidence proved and the Tax Court found that it was understood that Federighi would be the third director of Maxwell Hardware (T.C. 399), and that there was an oral agreement that Bryan would not be vetoed on any reasonable business investment he wished to make on behalf of Maxwell Hardware. Such evidence was probative and relevant on the issue of sham, an issue which has been permanently resolved against the Government, and on the issue under Section 269 of purpose to evade or avoid, an issue which has been conclusively determined against Petitioner, Maxwell Hard-

---

the consideration paid upon an acquisition by any person or corporation described in subsection (a) is substantially disproportionate to the aggregate—

"(1) of the adjusted basis of the property of the corporation (to the extent attributable to the interest acquired specified in paragraph (1) of subsection (a)), or of the property acquired specified in paragraph (2) of subsection (a); and

"(2) of the tax benefits (to the extent not reflected in the adjusted basis of the property) not available to such person or corporation otherwise than as a result of such acquisition,
shall be prima facie evidence of the principal purpose of evasion or avoidance of Federal income tax. This subsection shall apply only with respect to acquisitions after March 1, 1954."

ware. Such evidence, however, does not, in our view, justify an inference, as the Government asserts, that fifty per cent voting control was thereby acquired by Beckett and Federighi. A voting trust agreement is too valuable a vehicle for the effectuation of innumerable commercial transactions to be thus lightly impugned; and the eagerness of the Commissioner to collect taxes, a duty imposed on him by law, should not lead the courts arbitrarily to disregard established and useful forms of business relationships. The voting trust agreement invested the voting control in the trustee, not in Beckett or Federighi. If the evidence were such as to justify a finding that under all the circumstances, either the trustee bank or T. P. Coates, a designated director, was under the domination and control of Beckett and Federighi, the case would be different. There is no such evidence. The Tax Court correctly said: "We think it clear that the provisions of Section 269 are not applicable here because of the absence of the type of acquisition provided for therein." (T.C. 414.)

## APPLICABILITY OF SECTION 482

Congress has given discretionary authority to the Secretary of the Treasury in certain situations:

"In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses."

The Government, in its arguments based on Sections 382(a) and 269, infra, has repeatedly reemphasized that under the carefully designed legal relationships established by these facts, two separate businesses owned and managed by separate interests were being conducted under one corporate roof.

The Tax Court found that the transactions were not a sham, that Maxwell Hardware was the corporate taxpayer, and that the subdivision profits were the taxable income of Maxwell Hardware.

With respect to the tax liability of Maxwell Hardware, no reliance may be placed on Section 482 to justify a decision because the Commissioner did not rely upon it and gave no notice of such issues in his Notice of Deficiency to Maxwell Hardware. United States v. First Security Bank (9 CCA 1964), 334 F.2d 120; Commissioner of Internal Revenue v. Chelsea Products (3 CAA 1952), 197 F.2d 620; Ross v. Commissioner of Internal Revenue (5 CCA 1942), 129 F.2d 310.

Section 482 was, however, mentioned in the Tax Court opinion: "Although respondent in his notice of deficiency [6] referred to section 482 of the Internal Revenue Code of 1954, he does not argue the application of this section and in effect concedes that unless the transfer of the Bay-O-Vista land to Maxwell Hardware is considered a sham, section 482 is inapplicable in this case." And we have not alluded to it in this case just to raise a strawman and then blow him down. Sometimes plain statutory language is distorted by courts to achieve what appears to be a just result in a particular case. The Government seeks to have this Court do that with respect to Sections 172, 382 and 269 to attain what it deems to be the just result in this case. We decline to do so, and to justify ourselves to the fainthearted, we have wondered whether Congress actually did leave the Commissioner helpless in this situation.

6. The notice of deficiency referred to in this quotation is the notice to the individuals, Becketts and Federighis, not to Maxwell Hardware Co.

The opening statements of counsel before the Tax Court show that the Commissioner did rely upon Section 482 in his notices of deficiency to the Becketts and Federighis as individual taxpayers. Congress has not defined the meaning of "owned or controlled" under Section 482 as it has in Section 382(a) and 269, and a broad definition has been adopted in the Regulations [Regs. 1.482–1(a) (3)]:

"The term 'controlled' includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been aribitrarily. shifted."

It is arguable that the combination of factors in this case, such as the basic agreement, the preferred stock, the management contract with Federighi, the voting trust, the election of Federighi to the board of directors, the carefully drafted dissolution provisions allocating ninety per cent of the subdivision profits to the preferred stock, are sufficient to justify a conclusion that the subdivision business of Maxwell Hardware was controlled by Beckett and Federighi if the Commissioner, in his discretion, had properly so determined [Cf. Dillard-Waltermine Inc. v. Campbell (5 CCA 1958), 255 F.2d 453; National Securities Corp. v. Commissioner of Internal Revenue (3 CCA 1942), 137 F.2d 600; Rooney v. United States (9 CCA 1962), 305 F.2d 681; Commissioner of Internal Revenue v. Chelsea Products, supra], and if the Commissioner had also properly determined that it was necessary to allocate ninety per cent of the subdivision income to the individuals to "prevent evasion of taxes" (Sec. 482).

This, however, is not an issue before this Court on this petition for review and our comment is only a comment and not a judgment.

Nor do we suggest that the Section 482 issue is still alive in the Tax Court's consideration of the petitions for redetermination of the individual taxes of the Becketts and Federighis. The opening statements before the Tax Court make it clear that the consolidated trial before the Tax Court would definitely determine the common issue of whether the subdivision income was properly taxable to the corporation or to the individuals, and both parties on this appeal have accepted the Tax Court determination that the subdivision income was properly taxable to Maxwell Hardware.

## SUMMARY

This decision is reached in a straight-jacket.[7] We are bound by the Tax Court finding that the Maxwell Hardware transaction was a bona fide business transaction creating substantial, and not illusory, business relationships. We are concerned only with the tax liability of Maxwell Hardware, which, the Tax Court found, properly reported as its income the profit from the subdivision business. We are faced only with the problem of whether the net operating loss deduction generated by the hardware business may be taken against the income from its subdivision business.

The Tax Court considered this a special case, and said: "In so holding, we do not intend to establish a broad legal principle but merely to apply already established principles to an unusual factual situation." We think special cases are to be processed under Section 482 if applicable.

Libson Shops, decided under the 1939 Act, is no longer law. It has been superseded by the 1954 Internal Revenue Code

---

7. Prior to the reception of evidence in the Tax Court, Judge Scott expressed her opinion that it was "very unsatisfactory" to try all of one case and only part of others in a consolidated trial involving alternative claims with respect to determination of the taxpayer to whom taxable income should be assigned. We agree. Judge Scott deemed herself bound by the order of consolidation earlier entered by another judge on stipulation of counsel.

which, in Section 382, dealt specifically and differently with the concept of continuity of business enterprise upon which the Libson Shops decision was based.

Taxation is peculiarly a matter of statutory law, and in applying that law to the determination and computation of income and deductions, the Courts do not make moral judgments. There is nothing perfidious or invidious in enjoying a statutory deduction from reportable income. It is not a matter of conscience but of statute and the determination of Congressional intent. In our opinion, Congress has quite plainly said that net operating loss deductions should be allowed unless the special circumstances interpreted within the letter and spirit of Sections 382(a) and 269 obtain. The conditions disallowing the deduction have not been established here. It is of much more importance that businessmen, accountants, lawyers and revenue agents should retain confidence that plain statutory language means what it says and what it reasonably implies than that a particular deficiency assessment should be sustained. We cannot, within the statutory framework applying a fair and reasonable interpretation to the language used, disallow to Maxwell Hardware the net operating loss deduction.

The decision of the Tax Court is reversed.