TEXTRON, INC., Plaintiff, Appellee,

v.

UNITED STATES of America,
Defendant, Appellant.

No. 76–1446.

United States Court of Appeals,
First Circuit.

Heard Jan. 4, 1977.

Decided June 23, 1977.

Gary R. Allen, Atty., Tax. Div., Dept. of Justice, Washington, D. C., argued, with whom Scott P. Crampton, Asst. Atty. Gen., Myron C. Baum, Acting Asst. Atty. Gen., Lincoln C. Almond, Providence, R. I., U.S. Atty., Gilbert E. Andrews and Richard Farber, Atty., Tax Div., Dept. of Justice, Washington, D. C., were on brief, for defendant, appellant.

Peter J. Rothenberg, New York City, argued, with whom Edwards & Angell, Providence, R. I., Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Richard M. Borod, Providence, R. I., Morris B. Abram, Adian W. DeWind, Kevin J. O'Brien, and

Steven E. Landers, New York City, were on brief, for plaintiff, appellee.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and BOWNES,* District Judge.

COFFIN, Chief Judge.

In the 1950's Textron, Inc. had a wholly owned subsidiary, Hawaiian Textron, Inc. (Hawaiian). Hawaiian ran passenger ships between Hawaii and the West Coast and lost enormous sums of money in the process. In 1959, creditors foreclosed on its assets. Textron's six million dollar investment in Hawaiian's stock and debt became worthless, with one possible exception: Hawaiian's huge losses could be used to reduce its taxable corporate income in future years. Because Hawaiian had no income prospects, a second, profitable corporation would have to be merged into Hawaiian's empty shell to take advantage of its potential deductions. In 1959, the district court found, Textron had no specific plan to make use of this aspect of Hawaiian. In 1960, however, Hawaiian's name was changed to Bell Aerospace Corp., and, using Textron's funds, the renamed corporation acquired a successful business from Bell Aircraft.

Bell Aerospace made money, and it carried forward the old Hawaiian losses, amounting to some $6,745,000. At first the Internal Revenue Service (Service) disallowed any carry-over between two such different businesses. But in 1963 the Service reversed itself, ruling that a failing corporation may go into a new line of business and still carry forward losses from its earlier activity, so long as the owners of the corporation remain substantially the same. Rev. Ruling 63–40, 1963–1 C.B. 41. After the Service's change of position, Bell Aero-

space used Hawaiian's losses to reduce its taxes for 1960, 1961, and 1962.

Just prior to the rehabilitation of Hawaiian, Textron had tried another way to make the best of its bad investment in Hawaiian. It took a six million dollar deduction in 1959, claiming that Hawaiian's stock and debt became worthless to it in that year. The Service disallowed the deductions and assessed a deficiency. Textron paid and sued for a refund. In the district court and on appeal, the government has advanced only one argument—that Hawaiian's stock was not worthless in 1959 because the shell had potential value as a source of carry-over losses. The district court rejected this argument, as do we.

■ Ordinarily, bad debts and worthless stocks may be deducted only in the year in which they become wholly worthless. See 26 U.S.C. §§ 165(g)(3), 165(a), & 166(a)(1). See also 26 C.F.R. 1.165–4(a) (1976). By any ordinary definition, Hawaiian's stock was quite worthless, as the district court found, in 1959. The shell together with the losses could not be marketed to others, 26 U.S.C. §§ 269 & 382, see infra.; and while it was within Textron's power to rehabilitate the subsidiary, and, if profits were generated, deduct the tax losses on future tax returns, this contingency first required the infusion of brand new assets into what was a shell without assets—an initiative which created a wholly new ball game and certainly could not retroactively create value in 1959.

■ The government would have us cure what it perceives as an abuse of the tax laws by adopting its special definition of worthlessness.[1] But Congress has already considered the abuse of high loss corporate shells. The remedy it chose does not call

---

* Of the District of New Hampshire, sitting by designation.

1. We wonder, however, whether the government's argument is different in kind from a line of reasoning that would ultimately destroy the worthless stock deduction. Stock that becomes worthless in a particular year represents a significant tax gain for its owner. The deduc- tion that the stock permits has real economic value, a fact that could lead the government to make the same argument that it makes here: the stock has tax value, therefore it cannot be worthless. If accepted, such an argument would make it impossible ever to take a worthless stock deduction.

into question the deduction Textron seeks.[2] At one time, there was a large traffic in tax shells like Hawaiian, but Congress has now decreed that the buyer of such shells cannot take advantage of their tax attributes. 26 U.S.C. §§ 269 & 382. Thus, a failed company may have tax value today, but only if it has a large and healthy owner who is eager to acquire a second, more profitable business.

The Service has apparently made the argument it urges on us only once before. *See Becker v. United States*, 308 F.Supp. 555 (D.Neb.1970). There the taxpayers' closely held corporation failed in 1956, and the taxpayers took a worthless stock deduction. In 1957, the corporation acquired a new and profitable business, which used the old business's losses to offset its income. The Service argued that this showed the stock had not been worthless in 1956. The court rejected that claim:

"If this Court adopts the government's theory in this case every taxpayer, at least every taxpayer who has the control of a closely held corporation, knowledge of the tax advantages and a desire to utilize these advantages, will be unable to take a deduction for worthless securities. As stated before, under this theory the tax advantages to his holdings would prevent his declaring those holdings as worthless. This Court does not believe, where the only evidence of some potential value remaining in a stock is carryforward losses and the knowledge and desire to utilize them, that the taxpayer should be prevented from declaring the stock worthless. If taxpayer allowed 1956 to pass because of a desire to utilize the previous losses the only evidence during 1957 or any subsequent year of worthlessness would be futile attempts to make use of previous losses by forming a new corporation. As previously stated taxpayer must not only prove a stock is worthless but that it became worthless in the year in which the loss is taken. There would be no objective evidence of worthlessness for subsequent years as is present in 1956." *Id.* at 557.

We are inclined to agree with the *Becker* court, for if we were to adopt the Service's position we would introduce great uncertainty into this corner of tax law. A taxpayer who owned the bulk of a failed corporation's stock would be hard-pressed to determine when his stock became worthless. If he guessed wrong, he might well forfeit his deduction. *See, e. g., Keeney v. Commissioner of Internal Revenue*, 116 F.2d 401 (2d Cir. 1940). The year in which the stock lost all value would depend on such vague and subjective factors as the taxpayer's ability and desire to acquire another business. If the taxpayer lacked either desire or ability, the stock would be worthless when the corporation went under. Otherwise, it would continue to have worth for an uncertain period.[3] Some taxpayers

---

**2.** This is not to say, given the policy disfavoring double deductions referred to in the dissent, that the Treasury might not legitimately have gone beyond the language of the Code to construct, by regulation, a mechanism for limiting all deductions in this situation to one. Such a regulation would be less an interpretation of a particular provision than a means of avoiding what there is ample reason to assume Congress did not mean to permit. Quite likely if the Treasury had anticipated this situation, its regulation would have limited the subsidiary's later use of the carry forward losses in light of the parent's early election to claim a worthless stock deduction—the converse of the present approach. But whatever the actual mechanics, the regulation would have signalled the Treasury's intentions in an area where, otherwise, there is nothing to tell the taxpayer that he is lacking an open field. Textron, to be sure, as

the dissent notes, had no inherent right to a double deduction. It did, however, have a right to have the government proceed in accordance with the Code and regulations. *See Lan Jen Chu v. C.I.R.*, 486 F.2d 696, 704 (1st Cir. 1973) (concurring opinion). Loopholes cannot be repaired after the fact simply on the principle that to apply the law as written leads to a bad result.

**3.** The Treasury could, of course, determine worth in light of subsequent events, i. e., treating the stock here as worthless in 1959 only in light of the subsidiary's use of the losses in later years. But a rule holding up the computation of taxes in one year for years to come would seem unworkable. On the other hand if a retrospective approach were not adopted, taxpayers and the Treasury would be burdened with the speculations we have mentioned. The

might keep a loss shell, hoping to find a use for it, only to suffer unrelated losses that reduced their ability to obtain a second corporation. Under the Service's approach, they would have to decide whether their setback was so severe that the loss shell had suddenly become truly worthless. Other taxpayers, hoping to take advantage of their loss shell, might acquire a second corporation that unexpectedly loses money. The shell's carryover losses will be worthless to the taxpayers, but under the Service's theory, they and the courts will have to decide just when the shell lost all value.

The Service might very well become the ultimate victim of the doctrine it now advocates. If a corporation has a bad year, primarily because one of its subsidiaries goes under, it will probably prefer to take its worthless stock deduction later. Under the Service's approach, the corporation may do so, simply by going through the motions of seeking a second business for its shell. When the time for a deduction is more propitious, the "search" may be abandoned and the shell dissolved. The Service will have trouble proving that the corporation's heart was not in the hunt. A rule with so much uncertainty and room for abuse should not be judicially created to close a loophole that is apparently used so seldom. Admittedly, Textron has turned its Hawaiian sow's ear into a silk purse—and filled it at Treasury expense. But this is a matter

that should be cured by statute or regulation, not by a far reaching retroactive court decision.[4]

The dissent, agreeing that the Service's approach must fail, introduces a theory that the Service has advanced diffidently at best.[5] The dissent would brand as a "double deduction" Textron's worthless stock and debt claim and Bell Aerospace's carryover loss deductions. We have grave doubts about the dissent's casual eliding of the distinction between parent and subsidiary. They are separate taxpayers. In the absence of a consolidated return, cf. *Ilfeld Co. v. Hernandez*, 292 U.S. 62, 54 S.Ct. 596, 78 L.Ed. 1127 (1934), treating the two corporations as one may not be justified. But cf. *Marwais Steel Co. v. Commissioner of Internal Revenue*, 354 F.2d 997 (9th Cir. 1965). It is no answer to invoke the maxim that substance must prevail over form. Textron's subsidiary was never a sham corporation lacking any substantial business purpose. In the first place, we are not inclined to adopt a policy of ignoring the distinction between parent and subsidiary in all tax cases. In the second place, corporate taxation is an area of careful planning, planning that will be seriously disrupted if courts simply ignore separate entities whenever it seems "fairer" to do so. We decline to inject so massive and unsettling a dose of "equity" into the tax laws without a clear

---

Treasury could, of course, disallow a worthless stock deduction unless the parent dissolved the subsidiary, but such an approach would go beyond the present code and regulations, and might well impose unwarranted burdens in the generality of cases.

4. In any event, it is not clear that the government's approach would justify disallowing Textron's worthless debt deduction as well as its worthless stock deduction. Textron's stock carried with it the power to control Hawaiian, and thus to orchestrate acquisition of a new business. It is this power to control that the government believes valuable. No such power attends Textron's status as a major creditor, so it is hard to see how Hawaiian's debts had any continuing value to Textron after 1959, except to the extent that any worthless debt has value as a deduction. Cf. n. 1, *supra*. Because our decision rests on broader ground, we need not explore this difficult question further.

5. At the close of its main brief, the Service virtually concedes that the double deduction cases will not carry the weight the dissent puts on them:

"Since the worthless stock and bad debt deductions here in question were the first to be claimed, and since the net operating losses were claimed by a separate corporate entity it may well be that the 'double deduction' rationale of *Ilfeld Co. v. Marwais Steel* would not provide a sufficient basis, standing alone, to disallow the worthless stock and debt deductions here in issue if the stock and debt could be deemed to have become wholly worthless by the end of the year in question." Appellant's brief, p. 30.

All three members of this panel agree that the stock and debt at issue here should be so deemed.

invitation from the Service and a careful exploration of the issue by both sides.

 Moreover, attaching the label "double deduction" is not the end of analysis. We cannot decide this case by simply saying "No". We have a duty to explain ourselves and to set out a rule of law to govern future cases. One rule at which the dissent hints would treat Bell Aerospace's loss deductions like the recovery of a bad debt. This is not the case to apply such a rule. Textron's worthless stock and debt deduction, which is at issue here, was taken in 1959, before Bell Aerospace began to take advantage of Hawaiian's losses. Textron's deduction must have been proper at that time, for no "double" deduction had yet been sought. Later recovery of a properly deducted bad debt does not void the first deduction. *See* 5 J. Mertens, Law of Federal Income Taxation § 30.37 (1975). Rather, the recovery becomes income in the year of recovery. *See, e. g., West Seattle Nat'l Bank v. Commissioner of Internal Revenue*, 288 F.2d 47, 49 (9th Cir. 1961). Applying the dissent's "tax benefit" theory thus would lead us to question Bell Aerospace's deductions in 1960 and later years, but not the original deductions taken by Textron in 1959. The Bell Aerospace deductions, however, were allowed many years ago, after strict government scrutiny. If the Service wished to advance the theory developed by the dissent, it had ample opportunity to do so in the early 1960's when it examined Bell Aerospace's deductions. We cannot cure in this case the Service's decision not to attack those loss deductions.

At other points the dissent suggests that the first deduction should be disallowed because the second is no longer within reach. A rule invalidating worthless stock deductions because of later loss carryovers would be odd. Worthless stock deductions would linger in limbo for years before a taxpayer could know whether they were proper. The Service would be inclined to challenge every such deduction for fear that the shell's losses would later prove valuable to the taxpayer. Even if we agreed that separate corporate identities could be easily ignored, we would be reluctant to approve such a rule.

*Affirmed.*

BOWNES, District Judge (dissenting).

The majority opinion allows a conglomerate taxpayer to turn a multimillion dollar loss into a profit of approximately half a million dollars. The full import of this holding is that, whenever a corporate subdivision of a conglomerate has sustained substantial losses and becomes worthless, the parent corporation can, by acquiring a profitable business and placing it within the worthless corporate shell of its subsidiary, take a double deduction: one, by the parent for its worthless stock and debt, and, two, by the new business by way of a net operating loss carryover. This shell game means that the Government becomes an insurer of the business risks that the conglomerate undertakes. The decision is an open invitation to a conglomerate with a subsidiary losing money to allow it to become worthless so as to take advantage of a double tax deduction rather than attempt to put the subsidiary on a profitable footing.

The majority and I view the facts, the law and the issue from different perspectives.

The issue, as I see it, is *not* whether the taxpayer should be prevented from declaring its investment in a wholly owned subsidiary worthless at the time it actually becomes so, but whether the subsequent beneficial use by its wholly owned subsidiary of a loss carryover is a double deduction requiring disallowance of the loss taken by the parent for the worthless stock and debt.

Although I do not quarrel with my brethren's condensation of the facts, I think they should be set forth more fully so that the relationship between Textron and its subsidiary Hawaiian can be understood and appreciated. A careful analysis of the facts reveals that Hawaiian and Textron operated hand-in-glove and were distinct and separate corporate entities only as a matter of form.

In early 1956, Hawaiian Steamship Company (Steamship), a corporation in no way

connected with Textron, purchased a former World War II troop ship, the La Guardia, from the United States Maritime Administration for $3,850,438. The purchase price was largely met by the execution of a note secured by a first mortgage on the ship in favor of the United States. The mortgage provided that Steamship was to recondition the vessel to make it suitable for passenger service between the West Coast and the Hawaiian Islands.

Steamship approached Textron for financial help to refurbish the ship, and an arrangement was entered into whereby Textron purchased the vessel from Steamship at Steamship's cost and assumed the payment of the first mortgage note held by the Maritime Commission. Textron also agreed to recondition the vessel and charter it to Steamship for fifteen years at the rate of $100,000 per month. To reflect its new purpose, the name of the ship was changed to Leilani.

The operation was never financially successful. By October, 1957, Steamship was three months in arrears on its payment to Textron and owed substantial sums to other creditors. Textron repossessed the ship on November 22, 1957. On November 29, 1957, Hawaiian Textron, Inc. (Hawaiian) was incorporated as a subsidiary of Textron which paid $200,000 for 1,000 shares of stock and loaned Hawaiian $600,000 on a 6% note due December 1, 1967. On December 4, 1957, Textron chartered the ship to Hawaiian on substantially the same terms as it had previously been chartered to Steamship.

On February 11, 1958, officials of Textron and the Maritime Administration agreed that title to the ship would be transferred to Hawaiian. Textron guaranteed all conditions of the note and mortgage from the Maritime Administration. Hawaiian issued additional shares of stock and a promissory note to Textron in exchange for title and continued to operate the vessel as well as assuming Textron's obligations in regard to the Leilani's operation. Textron also advanced $589,843.32 to Hawaiian in return for an additional, unsecured promissory note.

Hawaiian operated the Leilani at a substantial loss, requiring continued financial assistance from Textron. In an effort to save its sinking business, Hawaiian's management chartered two additional ships in the hopes that a line with an expanded schedule would attract more customers. This effort was unsuccessful and the Leilani was drydocked.

On May 11, 1959, the Maritime Administration foreclosed on its mortgage and repurchased the ship. Hawaiian was left with a deficiency of $688,176.86. At this point, Hawaiian had no assets except nominal cash, accounts receivable, and office furniture. Total assets on June 6, 1959, were $139,000 with liabilities to creditors other than Textron of $1,254,000. In addition, Hawaiian owed Textron $4,585,476.02 in unpaid debt and accrued interest.

Textron's investment of nearly $6,000,000 was hopelessly lost and its investment worthless. Textron took tax deductions in the amount of $1,259,714.67 for worthless securities and $4,670,520.02 for bad debts for the taxable year ended January 2, 1960. The amount of the deductions claimed was computed as follows:

| | |
|---|---|
| Basis of Hawaiian Textron stock | $1,259,714.67 |
| Basis of Hawaiian Textron notes | 2,725,724.63 |
| Accrued and unpaid interest through June 2, 1959 | 213,374.61 |
| Open account advances through June 2, 1959 | 1,646,376.78 |
| Expenses paid on behalf of Hawaiian Textron | 85,000.00 |
| | $5,930,190.69 |

At the end of 1959, Hawaiian settled its deficiency with the Maritime Administration for $100,000, and Textron released Hawaiian from all of its obligations as a contribution to Hawaiian's capital. Hawaiian was now an empty shell with value only for tax purposes.

In April, 1960, Textron acquired the assets of the Bell Defense Group from Bell Aircraft Corporation using Hawaiian as the receptacle. Textron transferred approximately $16,500,000 to Hawaiian to purchase

Bell's assets, and Hawaiian's name was changed to Bell Aerospace Corporation (Bell).

Bell, in contrast with Hawaiian, made money. Hawaiian's operating loss carryover of $6,745,025.35 was claimed by Bell (pursuant to section 172 of the Internal Revenue Code), and was first disallowed and then allowed in accordance with a change in the Service's position in 1963.[1] The loss carryover was fully utilized by Bell.

The deductions for the worthless stock and bad debts of Hawaiian under sections 165 and 166 of the Internal Revenue Code, which Textron had already claimed on its return for the taxable year ended January 2, 1960, were disallowed on audit. At the time of the audit, Textron claimed an additional deduction in the amount of $41,541.47 for certain expenses incurred in connection with its investment in Hawaiian which had been capitalized and not fully amortized as of January 2, 1960. Textron was assessed a deficiency amounting to $3,974,106.36 plus $768,799.03 for interest of which $3,105,300.72 in taxes and $600,727.31 in interest are in issue here.

The net result is that Bell, a subsidiary of Textron, has been allowed to offset its profits by using a loss carryover that its predecessor, Hawaiian, had accumulated, and Textron has been allowed an additional tax deduction for its investment in Hawaiian.

At the outset of my analysis, I note that deductions for worthless securities and debts are treated separately in the Internal Revenue Code. Section 166 allows for deductions for bad debts. Subsection (e) specifically provides that it does not apply to worthless securities.[2] Section 165 of the Code, which is the general provision for the deduction of losses from gross income, applies to deductions for worthless securities.[3]

Although Congress may not have foreseen the possibility of worthless securities' subsequently acquiring value, it definitely anticipated that worthless debts might later acquire value. Accordingly, section 111 of the Internal Revenue Code provides for the recoupment by the Government of any deductions previously allowed for worthless debts which have become valuable to the taxpayer. It excludes from gross income a recovery of a previously deducted bad debt. But where that deduction resulted in an income tax benefit for the year of the deduction, as is the case here, it provides that the recovery must be included in gross income.[4]

---

1. Rev.Rul. 63–40, 1963–1 Cum.Bul. 46, changed the Internal Revenue Service's prior position by announcing that, in the absence of a change in stock ownership, it would allow a corporation to use its own net operating loss carryover to offset the income of a newly acquired business.

 If this case were the usual situation covered by section 269, where the loss corporation was the one acquired, the loss carryover would not have been allowed.

2. "This section shall not apply to a debt which is evidenced by a security as defined in section 165(g)(2)(C)." Section 166(e).

3. Section 165(g)(1) of the Code provides for the deduction of worthless securities which are capital assets in the hands of the taxpayer. Included as a security is "a share of stock in a corporation." Section 165(g)(2)(A). However, section 165(g)(3) provides that securities

 in a corporation affiliated with a taxpayer . . . shall not be treated as a capital asset.

 This clearly is the situation in the case at bar.

 Since only those worthless securities which are treated as capital assets are deductible un-

der section 165(g)(1), the worthless securities in this case are not deductible under section 165(g) as stated by the parties and the court below. They are, however, deductible under section 165(a). Regulation 1.165–5(b) provides:

 If any security which is not a capital asset becomes wholly worthless during the taxable year, the loss resulting therefrom may be deducted under section 165(a) as an ordinary loss.

Regulation 1.165–5(d) prescribes the rules under which the loss on worthless securities of an affiliated corporation are deductible as an ordinary loss. In order to take advantage of the deductions for worthless securities, the securities must be absolutely worthless. Regulation 1.165–4(a). There is no express provision for the recoupment of deductions for worthless securities which subsequently gain value.

4. *§ 111. Recovery of bad debts, prior taxes, and delinquency amounts*

 (a) General rule.—Gross income does not include income attributable to the recovery during the taxable year of a bad debt . . .

Tax Regulation 1.111–1(2) defines "recovery" to include "the receipt of amounts in respect of the previously deducted or credited section 111 items, such as from the collection or sale of a bad debt, refund or credit of taxes paid, or cancellation of taxes accrued." The loss carryover taken by Textron's subsidiary, Hawaiian, would seem to be such a recovery.

I am not suggesting that section 111 is inapplicable to worthless securities. The contrary may well be true. Regulation 1.111–1(a)(4) makes section 111 specifically applicable to worthless securities which are treated as capital losses. I see no reason why it might not also include, by implication, worthless securities treated as ordinary losses under section 165(a).

No distinction was made by the court below or the parties between worthless stock and a worthless debt when they framed the issue in terms of whether Textron's investment in Hawaiian, both stock and loans, became worthless in 1959 or whether it had value because of the potential use of a loss carryover. In the only case previously decided on that point, *Becker v. United States,* 308 F.Supp. 555 (D.Neb. 1970), it was held that a loss carryover did not add value to otherwise worthless securities. Insofar as I can determine from the reported case, *Becker* was concerned solely with worthless stock. While I concur with the majority that the tax benefits that may accrue to a defunct corporation are not, in and of themselves, sufficient to make an otherwise worthless corporation valuable, I do not think that this determination ends the case.

It is a well established principle that the Internal Revenue Code and the regulations promulgated pursuant to it are not to be construed as permitting a deduction for the

same loss twice. *United States v. Skelly Oil Co.,* 394 U.S. 678, 89 S.Ct. 1379, 22 L.Ed.2d 642 (1969); *Ilfeld Co. v. Hernandez,* 292 U.S. 62, 54 S.Ct. 596, 78 L.Ed. 1127 (1934); *Mitchel v. Commissioner of Internal Revenue,* 428 F.2d 259 (6th Cir. 1970); *Marwais Steel Co. v. Commissioner of Internal Revenue,* 354 F.2d 997 (9th Cir. 1965); *Missouri Pacific Railroad Co. v. United States,* 337 F.2d 637, 167 Ct.Cl. 725 (1964); *Ford v. United States,* 311 F.2d 951, 160 Ct.Cl. 417 (1963); *Candy Bros. Mfg. Co. v. Commissioner of Internal Revenue,* 198 F.2d 330 (8th Cir. 1952); *Robinson v. Commissioner of Internal Revenue,* 181 F.2d 17 (5th Cir. 1950); *Comar Oil Co. v. Helvering,* 107 F.2d 709 (8th Cir. 1939); *Commissioner of Internal Revenue v. National Casket Co.,* 78 F.2d 940 (3d Cir. 1935); *Baltimore and O. R. Co. v. Commissioner of Internal Revenue,* 78 F.2d 456 (4th Cir. 1935); *Levi Strauss Realty Co. v. United States,* 41 F.2d 55 (9th Cir. 1930). The Court in *Ilfeld Co., supra,* 292 U.S. at 68, 54 S.Ct. at 598, stated:

> The allowance claimed would permit petitioner twice to use the subsidiaries' losses for the reduction of its taxable income. By means of the consolidated returns in earlier years it was enabled to deduct them. And now it claims for 1929 deductions for diminution of assets resulting from the same losses. If allowed, this would be the practical equivalent of double deduction. In the absence of a provision of the Act definitely requiring it, a purpose so opposed to precedent and equality of treatment of taxpayers will not be attributed to lawmakers.

In *Marwais, supra,* a subsidiary's carryover losses were denied to its successor parent corporation, which had liquidated its subsidiary, where the parent had previously taken loss deductions for its advances to and investment in the subsidiary.

(b) Definitions.—For purposes of subsection (a)—

(1) Bad debt.—The term "bad debt" means a debt on account of the worthlessness or partial worthlessness of which a deduction was allowed for a prior taxable year.

\* \* \* \* \* \*

(4) Recovery exclusion.—The term "recovery exclusion", with respect to a bad debt,

. . . means the amount, determined in accordance with regulations prescribed by the Secretary or his delegate, of the deductions or credits allowed, on account of such bad debt, . . . which did not result in a reduction of the taxpayer's tax . . . reduced by the amount excludable in previous taxable years with respect to such debt . . .

The majority distinguishes this case from those cited above on the grounds that Textron and its subsidiary are separate taxable entities filing separate, not consolidated, returns. I feel that the court should look to the financial realities of how the corporations act and not the forms used. In interpreting tax law substance must prevail over form. *Commissioner of Internal Revenue v. Hansen,* 360 U.S. 446, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1959); *Commissioner of Internal Revenue v. P. G. Lake, Inc.,* 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958); *Wilkinson-Beane, Inc. v. Commissioner of Internal Revenue,* 420 F.2d 352 (1st Cir. 1970); *Palmer v. Commissioner of Internal Revenue,* 354 F.2d 974 (1st Cir. 1965).

The Internal Revenue Code is drawn to lessen or eliminate the burdens of double taxation in the case of a parent corporation and its subsidiary. Even where corporations elect to file consolidated returns pursuant to sections 1501 through 1506, the parent is subject to taxes on only 15% of distributions made prior to 1964 and may avoid taxation on any portion of dividends distributed in later years. Section 243. A corporation may also avoid recognition of a gain on the liquidation of a subsidiary. Section 332. Congress has recognized in these provisions that corporations and their wholly owned subsidiaries are not completely separate entities.

Textron realized that any distinction between Hawaiian and itself was only one of form when it published annual reports to its shareholders containing financial statements which show the results of operations of Textron and its wholly owned subsidiaries on a consolidated basis. The fact that Textron's funds were freely transferred to Hawaiian for the acquisition of Bell also shows that there was no real distinction between Textron and Hawaiian as separate corporate entities. Hawaiian was used as Textron's instrument for the purchase of Bell solely to avoid taxes.

It is necessary to look at what actually happened in this case. The operation of Hawaiian was subsidized by funds advanced by Textron totalling $5,971,732.16. Hawaiian's operating losses totalled $6,745,025.35. Hawaiian's successor, Bell, was able to use this operating loss carryover to offset its profits.

The money which Hawaiian lost and which allowed it to have a loss carryover was the same money that Textron invested in the securities and notes of Hawaiian. If Textron were not forced to advance funds to Hawaiian under the agreement with the Maritime Administration, Hawaiian would have sunk long before it did. Hawaiian kept afloat only because of the constant infusion of money from Textron, and it was Textron's funds which Hawaiian lost.

Bell took a tax deduction based on the loss which Hawaiian had incurred pursuant to section 172(b) and Rev.Rul. 63–40, 1963–1 Cum.Bul. 46.[5] There is no doubt that the securities and debt became worthless to Textron in 1959. But deductions for this investment should not be allowed now since Bell has already deducted the operating losses incurred by Hawaiian from its otherwise taxable income. The net effect of allowing this double deduction is a tax savings to Textron and it subsidiary in excess of the actual loss sustained.

Hawaiian had a total operating loss of $6,745,025.35. This amount was completely used by Bell for the tax years 1960, 1961,

---

5. In *Lisbon Shops, Inc. v. Koehler,* 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924 (1957), the Court ruled that a net operating loss carryover could be used only against income from the very same business which incurred the loss. This was the case regardless of continuity of ownership or form of business. *Norden-Ketay Corp. v. Commissioner of Internal Revenue,* 319 F.2d 902 (2d Cir.), *cert. den.,* 375 U.S. 953, 84 S.Ct. 444, 11 L.Ed.2d 313 (1963).

The 1954 Code provisions require a change in ownership as well as a change in business.

Section 169. The *Libson* doctrine does not apply to transactions since the enactment of the 1954 Tax Code. *Exel v. United States,* 451 F.2d 80 (8th Cir. 1971); *Frederick Steel Co. v. Commissioner of Internal Revenue,* 375 F.2d 351 (6th Cir.), *cert. den.,* 389 U.S. 901, 88 S.Ct. 219, 19 L.Ed.2d 217 (1967); *Maxwell Hardware Co. v. Commissioner of Internal Revenue,* 343 F.2d 713 (9th Cir. 1965). This result was recognized by the Internal Revenue Service at Rev. Rul. 63–40, 1963–1 Cum.Bul. 46.

and 1962. Textron claimed a deduction for worthless debts and securities in the amount of $5,971,732.16. The tax deductions for Textron and its subsidiary, Bell, total $12,716,757.51. If Textron and Bell are both taxed at the corporate rate of 52%, this deduction is worth $6,612,713.90 to Textron, which is more than the $5,971,000 which it invested in the first place. The majority holding means that the Government has subsidized Textron to the tune of over half a million dollars that it never lost. This is a pretty steep price to pay for avoiding uncertainty in a remote corner of the tax law.

The majority suggests that, because we are considering the first of the double deductions, the one for worthless securities and debts, rather than the second, the loss carryovers, we should ignore the mandate of *Ilfeld* and *Skelly Oil.* But the thrust of those decisions is not that deductions should be taken in their proper years, but that we are prohibited from construing the tax code so as to permit the use of a double deduction. Were we free to choose the footing of the case, we might well prefer to disallow the deduction for the loss carryover. But that option is not open to us, and we should follow the holding of *Ilfeld* and *Skelly Oil* in the case as presented.

It seems clear that both deductions inure to the benefit of the parent corporation, Textron, and both represent the loss of the same dollars. The result is that Textron is allowed the tax advantage of two deductions for the loss of the same money. This is a situation where, as in *Ilfeld, supra,* 292 U.S. at 68, 54 S.Ct. at 598, a result "so opposed to precedent and equality of treatment of taxpayers will not be attributed to lawmakers."

*I would reverse the judgment of the district court.*