MARY E. EVANS, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.
HELEN EVANS WHEELER, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket Nos. 95527, 95528. Promulgated June 27, 1940.

*Todd W. Johnson, Esq.*, for the petitioners.
*Byron M. Coon, Esq.*, and *Frank T. Horner, Esq.*, for the respondent.

OPINION.

KERN: The respondent determined that each of the petitioners received taxable gain in the amount of $37,500 upon the forfeiture and cancellation of the lease May 12, 1936. This gain is attributable to the value of the improvements placed upon the property by the lessee and taken over by the lessor upon cancellation of the lease. In their second amended petitions the petitioners each claim this determination to be in error to the extent of $36,914.

The question of whether the lessor realizes taxable gain to the extent of the added value to the property upon the forfeiture of a long term lease and the repossession of the property, including building and improvements erected thereon by the lessee at its own cost, has been decided by the Supreme Court adversely to the petitioner's contention in *Helvering* v. *Bruun*, 309 U. S. 461; and the petitioners in supplemental brief admit the decisive application of this case. The petitioners still contend, however, that the building and improvements erected by the lessee and taken over by them upon forfeiture of the lease did not increase the value of the property, but, on the other hand, were really an encumbrance on the land which entailed additional expenditures by way of taxes, maintenance, insurance, and repairs, without materially increasing the net income from the property.

On first impression this contention seems untenable, since the building in question was only six years old and erected by the lessees at a cost in excess of $100,000. But after carefully considering and evaluating all of the evidence, we agree with the petitioners.

The land upon which the building and improvements were erected cost petitioners $150,000. Its value in the taxable year, as established by the sale to the city of the lot directly across the street, was substantially the same.

The building erected on the property was a garage of concrete construction, low ceilings, and staggered floors connected by ramps and used for automobile parking. There is some evidence that it could be used for a few other purposes if remodeled, but there is no evidence that such use would produce a larger income than its use as a garage and the decision of the committee for the bondholders, who, after making an extensive survey of its adaptability to other uses, decided that its only practical use was that of a garage, is persuasive of that point in view of the fact that the bondholders were faced with the loss of their entire investment and were tremendously interested in making the building pay. The architectural construction of the building is a strong argument that its only practical use was that for which it was built.

Various valuations were placed on the property by local real estate dealers. After considering this testimony, we are of the opinion that the respondent's experts valued the property too high. The value of $195,000 by respondent's witnesses was based on a theoretical computation of the value of the building and had no foundation in practical fact. The respondent's value assumed two forms—one based on the "replacement cost" method, and the other based on the income method. The replacement cost of a building alone, as is clearly shown by the facts before us, does not determine its fair market value at a given time. The President Hotel, directly across the street from the garage property, sold in 1937 for approximately one-third of its cost. The Main Street Theatre building, which adjoins the garage property, cost in excess of $1,000,000, and now both land and building are being offered for $250,000. Nor is the market value of a building determined by a hypothetical showing of its possible income. The respondent's witnesses determined the value of the building on an income basis by assuming that its 300 car stalls would be filled all the time at a rental of $15 per month, but the respondent has failed to show that the 300 stalls were or could be filled all the time in the taxable year at a price of $15 per month. In fact there is evidence that some stalls rented for $8 per month in the taxable year, and the lessees, unable to keep up the payments of rent and taxes, forfeited their lease and surrendered property that cost them over $100,000, rather than continue to operate the property.

The record shows that for the period beginning August 1, 1932, and ending May 1, 1935, the petitioners agreed with the lessors to reduce the rent $2,000 per year and defer to August 1, 1935, the further sum of $3,000 per year. But, even with these concessions, it appears that on March 9, 1936, the lessees were in default in unpaid rent in the amount of $27,750, and taxes in excess of $7,500, or a total of $35,-000 in the period of approximately three and one-half years. At the

end of that period the bondholders, after a thorough investigation of the possibilities of the property, including other uses, surrendered their lease and took a total loss on their investment. Obviously the lessees would, if possible, have kept up the rent and taxes to protect their investment. That they did not do so convinces us that the business was not sufficient to pay the rent and that the value of the property as computed by the respondent did not reflect its fair market value May 12, 1936. In the light of the evidence it is extremely doubtful if the garage property had sufficient business to pay one-half the rent it was obligated to pay. As a matter of fact it did not do so in the three and one-half years prior to the surrender of the lease.

The petitioners' witnesses valued the property as of May 12, 1936, at $125,000. The entire value was allocated to the land, on the theory that the building was in fact an encumbrance which could not be removed without a cost of $5,000 in excess of its salvage value, and that it did not yield enough additional income over the income from the land as a parking lot to meet the increased expenditures which it entailed, such as taxes, maintenance, and insurance.

The record discloses that the garage property was over three blocks from the main business center of the city, that it was uphill from the business section, and that there were four parking lots in the same block and approximately fifteen parking lots and two garages in the adjacent blocks, besides numerous other parking lots and garages located nearer to the business district than the garage property here in question.

Considering all the facts in the record, we find that the fair market value of the land with building and improvements was not in excess of its fair market value without such building and improvements as of May 12, 1936, when the lease was forfeited and the property taken over by the petitioners. The Commissioner erred in determining that petitioners received taxable income upon the forfeiture of the lease to the extent of $36,914 each.

In the taxable year petitioners expended, in connection with the cancellation of the lease and the recovery of the property, attorney fees in the amount of $1,500, fees for the abstract of title $25.50, and sums apparently paid in connection with the personal property in the amount of $33.60. Petitioners claim that these expenditures, totaling $1,559.10, should be allowed as a deduction in computing their net taxable income for 1936 as ordinary and necessary business expenses. The Commissioner argues that the items of $1,500 and $25.50 are capital expenses, which would serve only to reduce the net gain to the petitioners attributable to the value of the building at the time of acquisition, and that the other items do not enter into the situation.

We think the attorney fees and the title abstract fee in the total amount of $1,525.50, while occasioned on account of the cancellation of the lease and the repossession of the property, were in the nature of unavoidable expenditures incident to the forfeiture and termination of the contract of lease and are to be distinguished from *Henry B. Miller*, 10 B. T. A. 383, and related cases, cited by the respondent, where payments made by the lessor for the cancellation of the lease were held to be capital expenditures, recoverable through deductions spread over the unexpired term of the lease. Here the lease was forfeited by the fault of the lessee and the resulting expenditures by the lessor were a loss incident to such default and are deductible as such from gross income in the taxable year.

Petitioner has failed to show that it is entitled to deduct expenditures in the amount of $33.60, apparently made in connection with the personal property and a mortgage.

Neither of the petitioners claimed any deduction for income taxes paid by them to the State of California in the taxable year. Petitioner Mary E. Evans paid $643.60, and petitioner Helen Evans Wheeler paid $1,015.89. There is no question but that the amount of income taxes paid was the personal liability of the respective petitioners. We hold that they are entitled to a deduction from gross income in the respective amounts under section 23 (c) of the Revenue Act of 1936.

Petitioners in 1936 paid special assessments against the property that had become due prior to the forfeiture of the lease in the amount of $5,410.86, allocable to the condemnation bonds and $676.36 interest due on such bonds. There is no evidence in the record that the improvements for which the assessment was levied were not a benefit to the property. The assessment paid in the amount of $5,410.86 is therefore not deductible in the taxable year under section 23 (c) (4), Internal Revenue Code; *P. J. Hiatt*, 35 B. T. A. 292; *F. M. Hubbell Son & Co.*, 19 B. T. A. 612; affd., 51 Fed. (2d) 644; certiorari denied, 284 U. S. 644. The interest paid, however, has a different status and is deductible as interest paid in the taxable year, one-half or $338.18, being deductible by each petitioner. Sec. 23 (c) (4), Internal Revenue Code. *Evens & Howard Fire Brick Co.*, 8 B. T. A. 867; *Andrew Little*, 21 B. T. A. 911; *Lee Wilson & Co.*, 25 B. T. A. 840; *Chapman & Dewey Lumber Co.*, 25 B. T. A. 1166.

In the taxable year the petitioners, after repossession of the property, paid state, county, and city taxes on the property in the total amount of $9,867.69. Of this amount $5,386.18 was in default for the years 1934 and 1935, and $3,835.27 became a lien on the property after it was repossessed in 1936. They also paid interest on the amount in default in the sum of $646.29. The respondent contends that the amount in default was an obligation of the lessee to be paid as rent

and that the petitioners merely paid the obligation of another and can not claim as deductions such payments from gross income in the taxable year. The petitioners contend that these amounts were not included as deductions from gross income in the income tax returns of petitioners for the taxable year, and are properly deductible.

Regulations 94, article 23 (a)–10, interpreting the Revenue Act of 1936, which was in force in the taxable year, provides, among other things, that: "Taxes paid by a tenant to or for a landlord for business property are additional rent and constitute a deductible item to the tenant and taxable income to the landlord, the amount of the tax being deductible by the latter." The same language has been continued in subsequent regulations. Obviously the regulations regard the owner of the fee as having the obligation to pay the taxes, which, if unpaid become a lien on the property. The fact that the lessee defaults on the payment of taxes does not change the situation. The landlord on a cash basis is entitled to deduct the amount of the taxes which should have been paid by the lessee but are paid by the landlord, in the year in which he pays them. We hold, therefore, that the petitioners are entitled to a deduction from gross income of the taxes paid during the taxable year which had become a lien against the property, together with the interest paid on the taxes in arrears and such deductions will be allocated one-half to each of the petitioners.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

Mellott dissents.