JACQUELINE, INC., ET AL., 1 Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Jacqueline, Inc. v. CommissionerDocket Nos. 2982-65, 4708-65, 5701-65, 1560-66, 3731-66, 4596-66, 512-67, 2201-70, 2304-70, 2305-70, 2306-70, 5231-70.United States Tax CourtT.C. Memo 1977-340; 1977 Tax Ct. Memo LEXIS 107; 36 T.C.M. (CCH) 1363; T.C.M. (RIA) 770340; September 27, 1977, Filed Louis D. Curet, for the petitioners. Bruce A. McArdle and E. M. Quijano, for the respondent. DAWSONMEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These consolidated cases were assigned to and heard by former Special Trial Judge Joseph N. Ingolia pursuant to Rules 180 through 182, Tax Court Rules of Practice and Procedure. His report was filed on April 14, 1977, and subsequently the parties filed certain exceptions to it. The exceptions have been considered and, for the most part, are rejected. Some modifications*110 have been made in the report of the former Special Trial Judge. In almost every material respect his findings of fact are adopted. The Court also agrees with and adopts his views and conclusions on the legal issues except for the depreciation deduction claimed by Southland which is discussed in the Opinion as Issue 3--Constructive Ownership. Respondent determined deficiencies in the Federal income taxes and additions to tax with respect to the petitioners, as follows: JACQUELINE, INC.Additions to the TaxDocketTaxable YearInt. Rev. Code of 1954 2NumberEndedDeficiencySec. 6651(a)Sec. 6653(a)2982-6510-31-59$12,985.36$ 715.27$ 715.2710-31-6010,218.70567.55567.5510-31-618,573.82-428.691560-6610-31-628,577.73-428.89512-6710-31-636,226.59311.33400.652306-704-30-649,643.682,410.92482.18THE LeBARON CORPORATION4708-6510-31-60$37,253.06$9,313.26-4596-6610-31-6117,526.784,381.70$ 876.3410-31-6237,994.989,498.751,899.752305-7010-31-6327,075.806,768.951,353.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,084.143,771.04754.21MOTOR HOTELS OF LOUISIANA, INC.5701-654-30-59$ 8,530.52-$ 426.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,619.28-1,130.964-30-616,406.65-320.334-30-623,234.57$ 161.73161.733731-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,397.91-1,069.902304-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,244.328,061.081,612.224-30-652,085.61521.40104.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,882.075,720.521,144.10*111 SOUTHLAND INNS, INC. DeficiencyDocketTaxablePer Stat.IncreasedNumberYr. EndedNoticeDeficiencyTotal2201-704-30-65$ 84,429.31$49,918.49$134,347.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,074.6043,487.7288,562.325231-7 04-30-6799,647.7442,461.88142,109.624-30-68116,793.92-116,793.92Additions to the TaxInt. Rev. Code 1954, Sec. 6651(a)DocketPer Stat.IncreasedNumberNoticeDeficiencyTotal2201-70$21,107.33$12,479.62$33,586.9511,268.6510,871.9322,140.585231-7 024,911.9410,615.4735,527.4129,198.48-29,198.48Various concessions have been made by the parties both before and after trial, and will be given effect in the Rule 155 computations. The issues remaining for decision are as follows: 1. Whether LeBaron Corporation is entitled to a net operating loss deduction for the taxable year ended October 31, 1960, following its Chapter X (Bankruptcy Act) reorganization when the losses were incurred prior*112 to the reorganization; and, if so, the amount of the net operating loss. 2. The depreciable useful lives of two motels owned by Jacqueline, Inc. and LeBaron Corporation and the basis for depreciation of the LeBaron Corporation property. 3. Whether Southland Inns, Inc. is entitled to deductions for depreciation, taxes, and interest incurred on or with respect to certain real estate and improvements thereon, legal title to which was held by Jacqueline, Inc. and LeBaron Corporation; and, if so, whether it may use a stepped-up basis for depreciation purposes. 4. Whether Southland Inns, Inc. is entitled to file consolidated returns with Motor Hotels of Louisiana, Inc. and Motels, Inc. in the fiscal years ended April 30, 1967 and 1968, and is entitled to a full surtax exemption of $25,000. 5. Whether the failure of LeBaron Corporation, Jacqueline, Inc., and Motor Hotels of Louisiana, Inc. to file timely corporate income tax returns was due to willful neglect under section 6651(a). 6. Whether any part of the underpayment of tax of LeBaron Corporation, Jacqueline, Inc., and Motor Hotels of Louisiana, Inc. was due to negligence or intentional disregard for rules and regulations*113 under section 6653(a). FINDINGS OF FACT The stipulated facts are so found and, together with the exhibits attached thereto, are incorporated herein by this reference. Net Operating Loss DeductionPetitioner LeBaron Corporation (hereinafter called LeBaron) is a corporation organized under the laws of Louisiana since November 27, 1957. LeBaron's principal offices were located in New Orleans, Louisiana, when the petitions were filed herein. For each of the taxable years in issue, LeBaron filed its U.S. Corporation Income Tax Return (Form 1120) with the District Director of Internal Revenue, New Orleans, Louisiana.During the periods here involved, LeBaron operated on a fiscal year basis ending October 31st of each year, except for the fiscal year ended April 30, 1964. The capitalization of LeBaron from November 27, 1957, until confirmation of a plan of reorganization under Chapter X of the Bankruptcy Act, consisted of 100 shares of capital stock of a value of $100 per share, or a total of $10,000. The stock ownership of LeBaron from November 27, 1957, until confirmation of a plan of reorganization under Chapter X was as follows: Lionel S. Boulmay, Jr., president and*114 organizer of the corporation-- 98 shares; Elva P. Boulmay, wife of Lionel--l share; and Segrid L. Boulmay--l share. LeBaron constructed the LeBaron Motel located in New Orleans, Louisiana. The motel began operation under the management of Lionel S. Boulmay, Jr., on May 17, 1958. On October 10, 1958, LeBaron filed a petition with the United States District Court for the Eastern District of Louisiana, for corporate reorganization under Chapter X of the Bankruptcy Act. On July 31, 1959, Roy Occhipinti and Frank Occhipinti (hereinafter referred to as the "Occhipinti group") submitted a plan of reorganization to the Bankruptcy Court for approval. An amendment to the plan was filed by the Occhipinti group on August 31, 1959. The plan, as amended, was approved on September 4, 1959, and confirmed on October 7, 1959. From October 10, 1958 until October 7, 1959, the LeBaron Motel was operated by the trustee in bankruptcy. According to the plan of reorganization, the Occhipinti group received all the stock and assets of LeBaron in exchange for $690,000 in cash. The book value of the assets as of October 31, 1959, was $796,965.05. All levies, mortgages, and other encumbrances on the*115 real and movable property of LeBaron were canceled. The issued and outstanding stock certificates of LeBaron were declared canceled and void as of the date of transfer to the Occhipinti group. New certificates were ordered for the authorized and outstanding shares in the manner directed by the Occhipinti group. However, LeBaron was not liquidated after the reorganization. The Occhipinti group continued the operations of LeBaron while seeking a Holiday Inn franchise. On November 12, 1959, the Occhipinti group entered into a licensing agreement with Holiday Inns of America, Inc. The agreement provided that the existing LeBaron Motel was to be converted into a Holiday Inn. A completion date of April 15, 1960, was contemplated with operation under the Holiday Inn system to begin on that date. In order to comply with the conversion specifications, the swimming pool, kitchen, lounge, and restaurant of the old LeBaron Motel were demolished sometime during the 1960 fiscal year. While in reorganization, LeBaron reported net operating loss deductions of $80,896.01 and $23,853.50 for the fiscal years 1958 and 1959, respectively. For the fiscal year 1960, LeBaron claimed a net operating*116 loss deduction of $104,749.51. Respondent disallowed the claimed deduction and determined that $60,660 of the net operating loss deduction for fiscal years 1958 and 1959 was for capital expenditures. These disallowed expenditures were for: Salary$32,500Financial Services23,500Appraisals1,000Finders' Fee2,640Inspection Fee1,320Useful Lives of MotelsPetitioner Jacqueline, Inc. (hereinafter called Jacqueline) is a corporation organized under the laws of Louisiana since October 28, 1958. Jacqueline's principal offices were located in Metairie, Louisiana, when the petitions were filed herein. For each of the taxable years in issue, Jacqueline filed its U.S. Corporation Income Tax Return (Form 1120) with the District Director of Internal Revenue, New Orleans, Louisiana. Petitioner Southland Inns, Inc. (hereinafter called Southland) is a corporation organized under the laws of Louisiana since May 14, 1964. Southland's principal offices were located in Orleans Parish, Louisiana, when the petitions were filed herein. For each of the taxable years in issue, Southland filed its U.S. Corporation Income Tax Return (Form 1120) with the District*117 Director of Internal Revenue, New Orleans, Louisiana. A corporation known as Carbone-West No. 1 Hotel Builders, Inc. (hereinafter referred to as Carbone-West) obtained a franchise from Holiday Inns of America, Inc., pursuant to which it built a motel at 5733 Airline Highway, Jefferson Parish, Louisiana (U.S. Highway 61). This motel, known as Holiday Inn West, was constructed in accordance with the specifications and requirements of the Holiday Inn franchise. It was completed and open for business on April 1, 1958. Jacqueline purchased the land and improvements of Holiday Inn West on or about October 30, 1958. Jacqueline was the owner of Holiday Inn West during the taxable years 1959 through April 30, 1964. On or about November 12, 1959, LeBaron, under the control of the Occhipinti group, obtained a Holiday Inn franchise for its motel located at 4861 Chef Menteur Highway, New Orleans, Louisiana (U.S. Highway 90). Because the LeBaron motel had not been built according to Holiday Inn specifications, some modification was required. This motel was known as Holiday Inn East.Leon S. Porier, Frank Olah, and Douglas Black (hereinafter referred to as the "Poirier group"), principal*118 stockholders of Southland, purchased the stock of both Jacqueline and LeBaron from the Occhipinti group on or about April 7, 1964.The Holiday Inn franchise of both motels was assigned to the Poirier group for the remainder of the franchise's original 20-year term.No extension could be obtained. On February 28, 1969, the Poirier group sold both Holiday Inn West and Holiday Inn East to Inn Operations, Inc., a subsidiary of Holiday Inns of America, Inc. The sale was made in settlement of a lawsuit brought by the Poirier group to enjoin Holiday Inns from canceling their franchise. Holiday Inns of America subsequently received title to both Holiday Inn West and Holiday Inn East. It leased the land and buildings of the motels to Topeka Inn Management, Inc. for a 22-year period with seven 10-year renewal options. Topeka Inn Management was also given a year-to-year management contract. As of June 1974, both motels were operated as part of the Holiday Inn chain. Membership in the Holiday Inn chain provides certain advantages which facilitate the operation of a motel. One such advantage is the right to participate in "Holi-Dex," a nationwide referral and advance reservation system. *119 On an average a Holiday Inn receives 30 percent of its business through referrals. Holiday Inn East and Holiday Inn West relied even more heavily on the system, and more than 70 percent of their business is attributable to Holi-Dex reservations. Normally a motel may qualify for membership in the Holiday Inn chain only if it meets certain minimum standards as to unit size, structural soundness, design, and location.The location must appear conducive to profitable operation, i.e., the economic climate of the surrounding area must be healthy and the nearby highways must carry a substantial amount of traffic. In order to keep its franchise for the normal 20-year term, a Holiday Inn must comply with certain operational standards and must also remain profitable. Operational standards are enforced by quarterly inspections of the motel, the restaurant, and the overall facilities. Occupancy rates and economic yield figures are reviewed by an official of Holiday Inns of America, who must recommend whether to continue or terminate a franchise. Most motels which lose their franchises survive as independently run operations. However, factors which reduce a motel's occupancy rate and profitability*120 to the Holiday Inn Corporation also affect its profitability as an independently run operation. Such factors include a decrease in the traffic flow bringing travelers past the motel, an adverse change in the commercial environment, physical deterioration of the motel over a period of time, and competition from motels of more modern design. Although the average occupancy rate at which Holiday Inns are profitable is somewhat higher, the Holiday Inn Corporation estimated a 60 percent break-even rate for Holiday Inn East and for Holiday Inn West. The occupancy rates required to make earlier investment profitable were in excess of 80 percent. Between 1964 and 1969, the occupancy rates had been in the range of 90 to 95 percent. After 1969, the rates declined, and in 1973 and early 1974, they were about 60 percent.Holiday Inn East had rates of 51.2 and 50.1 percent in 1970 and 1971, then made a recovery to about 61 percent. Holiday Inn West had rates of 51.2 percent, 65.7 percent, 54.9 percent, 65.5 percent, and 59.0 percent in the fiscal years ended 1970, 1971, 1972, 1973, and the short year ended May 24, 1974, respectively.Holiday Inn West is a complex consisting of seven separate*121 one or two story buildings. Four two story buildings house the motel units and are built of steel frames and steel bar joists which support a poured concrete deck, concrete slab balconies, and a concrete roof. Two of the buildings consist of back-to-back units separated by a chase or passageway. The other two buildings consist of single units, not back-to-back units. The buildings which do not house motel units are also of steel and concrete structure. There was physical deterioration of the buildings. Metal flashings on five of the buildings showed signs of leaking. On four of the buildings this allowed water to drip onto the balconies. The air conditioning system leaked, and drip pans installed in each room frequently overflowed, causing damage to guests' clothing. The masonry walls of one building exhibited diagonal cracks. On four buildings, the caulking around the windows and doors had dried and cracked, and several of the doors were warped. The bases of the back walls of four buildings had deteriorated. Dry rot and termite damage was present, particularly in the passageway or chase between the rooms which were built back to back. It was impossible to establish the*122 precise time period during which these defects developed. Despite some excessive wear and tear, no major structural problems exist. Holiday Inn East is a complex consisting of six separate one and two story buildings. Five of the six buildings were constructed in 1957. Three of these house motel units. The sixth building, containing 62 units, was constructed in 1966. All six buildings are built on concrete slab foundations. The three buildings built in 1957 which house motel units are two story wood framed structures. One of the buildings houses back-to-back units.The exterior walls at the entrances are brick veneer at the lower units and plywood siding at the upper units. The rear walls of two of these buildings are cement stucco. Each building has a wood framed balcony which runs the full length of the units to afford access to the second floor. Directly above each balcony, the roof extends out to provide cover. The facia boards at the roof overhang. The balconies consist of approximately two inches of light weight concrete on a plywood deck which is supported by wood joists cantilevering out from the floor system. The handrails along the balcony are pipe supported*123 by vertical wooden members and wood framing. Metal stairs to each balcony are vertically supported by pipe columns and are laterally supported by bolting the landings to the facia along the edge of the balconies. These three buildings have the greatest amount of deterioration. Dry rot or another form of deterioration has affected 40 to 50 percent of the facia material. The wood member connecting the wood joists was similarly affected, as were the ends of the joists at the facia, and the facia itself where the stairways were attached. The plywood decks on the balconies were deteriorated, as was the soffit. There were numerous cracks in the stucco causing water leakage into the buildings. Termite damage was present, especially in the bathrooms. Bathroom tiles and metal fixtures were damaged. Two of the buildings had settled to some degree, and walls of two buildings had separated from the wood framing. Leaks in the flashing and window caulking appeared in various locations. In 1960 or 1961, within three to four years after construction, new roofs were installed on all the original buildings. From 1966 to 1969 maintenance problems caused some rooms to be closed. Improper*124 drainage caused the flooding of a small number of rooms. About 80 to 90 tubs had to be replaced at one point. The roof leaked in two buildings. Sliding windows and screens had to be installed in one building to make the rooms more weatherproof. Some dry rot and termite damage was present. As of 1972, extensive repairs were necessary to prevent major structural damage in two to five years. However, it was impossible to establish the exact time period during which the pre-1972 deterioration took place.Except for one part of each of three buildings, all the necessary repairs at Holiday Inn East were minor. The newest building of the Holiday Inn East complex, the 62 units constructed in 1966, is a two story structure. Although the building showed some signs of excessive wear and tear, no structural distress was present. The design and materials of the original buildings at Holiday Inn East and Holiday Inn West were average to good. The design and materials of the new 62-unit building at Holiday Inn East were comparable to those used in modern motel construction. The repair and maintenance program at both Holiday Inn East and West was normal. After the Poirier group*125 acquired Holiday Inn East in 1964, extensive repairs were made. Almost all of the defects of both motels could be corrected by normal maintenance. Although Holiday Inn East failed to meet the inspection standards of a Holiday Inn franchise on two occasions, the necessary repairs were made in order to meet such minimum requirements. Holiday Inn East is located on U.S. Highway 90, which was the only traffic artery servicing New Orleans from the east. Holiday Inn West is located on U.S. Highway 61 and formerly was the most convenient motel to the airport. On February 11, 1958, a public hearing was held to announce the proposed route of a new interstate highway, Interstate 10. This proposed highway rerouted traffic from U.S. Highways 90 and 61, bypassing Holiday Inns East and West. The interstate was completed in stages. The portion ending in the nearest intersection to Holiday Inn East was completed on December 16, 1965. The portion ending in the nearest intersection to Holiday Inn West was completed on January 17, 1968. The annual average daily traffic count before and after Interstate 10 was completed shows a decline in the volume of traffic on Chef Menteur and Airline*126 Highways. The location of an interstate highway is crucial to the economic viability of a highway motel. The mortgage officer who made an economic appraisal of Holiday Inns East and West was of the opinion that the motels had a useful life of twelve years from 1964.This estimate was based on the age of the motels and the expected decline in occupancy as a result of the new interstate. Mr. Poirier, president of Southland, was aware of the interstate problem when making depreciation estimates in 1959; as accountant for LeBaron and Jacqueline; and in 1964 as owner of Holiday Inns East and West. It was the intention of the Poirier group to demolish Holiday Inn East in fifteen years and Holiday Inn West in twenty years. The Poirier group intended to build more modern motel facilities to compete with the new Holiday Inns being built in the New Orleans area. Construction of one such Holiday Inn, a high rise located near Holiday Inn East, was begun in 1966 and was completed and opened in 1968. The older design of Holiday Inns East and West, especially East, accounted to some degree for a decline in business. Both Holiday Inns East and West were originally located in economically balanced*127 neighborhoods. After 1969, the economic climate of these areas was in a decline. The amount of economic deterioration that occurred prior to this time was not known, although the areas began deteriorating well before 1969. Petitioners claimed a useful life of eighteen years from 1958 for all the buildings at Holiday Inn East and twenty years from 1958 for Holiday Inn West. Respondent made the following determinations: (1) twenty-nine years for the original buildings of Holiday Inn East from October 1959; (2) thirty years for the restaurant constructed at Holiday Inn East in 1961; (3) thirty years for the additional 62 units constructed at Holiday Inn East in 1966; and (4) thirty years for all the buildings at West from November of 1958. As to the 62 additional units, new motel units built shortly after the original units are usually depreciated over the remaining useful life of all the units. This is contrary to the method used by respondent. The useful lives determined by respondent are shorter than those suggested by industry standards. The useful lives determined by petitioners are less than the rates used by Holiday Inns of America. Holiday Inns would depreciate*128 the two story brick veneer buildings of East and West over a thirty-year period. These rates, however, are the result of a compromise between respondent and Holiday Inns of America. Constructive OwnershipPetitioner Motor Hotels of Louisiana, Inc. (hereinafter referred to as Motor Hotels) is a corporation organized under the laws of Louisiana on October 28, 1958.The principal offices of Motor Hotels were in Metairie, Louisiana, when the petitions were filed herein. For the fiscal years 1959 through 1966, Motor Hotels filed its United States Corporation Income Tax Returns (Form 1120) with the District Director of Internal Revenue, New Orleans, Louisiana. The Poirier group acquired the stock of Jacqueline and LeBaron in April of 1964 in exchange for cash, notes, and assumed liabilities. In May 1964, Southland was incorporated. For all the taxable years in issue, legal title to Holiday Inns East and West was held by LeBaron and Jacqueline, respectively. The legal title to the land purchased in 1964 adjacent to Holiday Inn East and the 62 units constructed on it was held by Southland. A sale of the assets of LeBaron and Jacqueline to Southland, followed by a liquidation*129 of both corporations, was contemplated by the Poirier group. Documents of sale were drafted in February of 1965 to be executed after a permanent financing arrangement was obtained by Southland. The mortgage obtained from National Life Insurance Company of Vermont was originally intended to be undertaken by Southland alone. A document to this effect was drafted but not executed. Instead, the mortgage was executed by LeBaron, Jacqueline, and Southland on February 12, 1965. The original plan to transfer title to Southland before executing the mortgage was not implemented because of unsettled claims against Jacqueline and LeBaron. Both corporations had creditors' claims outstanding and LeBaron also had a personal injury claim against it. It was thought by the attorney for the Poirier group that a transfer of assets while these matters were pending would cause further legal problems. In March 1965, a plan of liquidation for Jacqueline and LeBaron was adopted by the Poirier group and filed with respondent. The plan was not implemented because of the pending lawsuits, franchise negotiations between the Poirier group and Holiday Inns of America, and construction difficulties*130 with the additional 62 units. In 1966, the Poirier group, Southland, Jacqueline, LeBaron, Motels, Inc., 3 and Motor Hotels all were parties to a lawsuit against Holiday Inns of America. The suit sought an injunction against Holiday Inns from canceling the Holiday Inn West franchise and $225 million in damages. A transfer of assets was not possible while this suit was pending. All franchise, mortgage, tax, and insurance payments were made by Southland. The checks were drawn on Southland's checking account. This was the only bank account maintained by the corporations. The daily receipts of Holiday Inns East and West were deposited in Southland's checking account. Separate expense accounts were maintained for Motels, Inc., Motor Hotels, and Southland. Although all disbursements were made from Southland's bank account, the expenses for each of these corporations were separately entered on each account. Southland reported the income from Holiday Inns East and West on its tax returns. Jacqueline and LeBaron filed their final income tax returns on April 30, 1964. The parties*131 agree that Southland does not have legal title to the land and improvements of Jacqueline and LeBaron. Respondent disallowed Southland's interest, tax, and depreciation deductions based on the properties to which Jacqueline and LeBaron hold legal title. Respondent allowed Southland to deduct the portion of the interest deduction for mortgage payments attributable to the 62 additional units and any additional interest and taxes paid on these units. Respondent also allowed Southland to deduct the remainder of the interest and taxes claimed as a rental expense deduction. Although Southland intended to take a stepped-up basis for the purchase price of LeBaron, Motor Hotels, and Jacqueline, it failed to do so. Instead, a carryover basis for depreciation was used for the taxable years in issue. Consolidated Returns and Surtax ExemptionSouthland's Federal income tax returns for the fiscal years 1967 and 1968 included the income and deductions of Motels, Inc. and Motor Hotels. These returns were untimely filed without an extension from the district director. A consent form (Form 1122) was not filed by either Motels, Inc. or Motor Hotels. Neither Motels, Inc. nor Motor Hotels*132 filed separate returns for the fiscal years 1967 and 1968. Affiliations Schedules (Form 851) were not attached to Southland's returns. The Poirier group owned 97 percent of the stock of Southland, Motels, Inc., and Motor Hotels. There is no evidence in the record showing that Southland owned the stock of Motels, Inc. and Motor Hotels. Respondent disallowed Southland's consolidated return and the full surtax exemption claimed for the fiscal years 1967 and 1968. Delinquency and Negligence PenaltiesWith one exception, petitioners were not granted extensions of time in which to file their income tax returns. LeBaron received such an extension for the 1960 taxable year from the District Director of Internal Revenue, New Orleans, Louisiana. LeBaron's returns for the taxable years 1960 through 1964 showed no taxes due. The consolidated returns of Southland, Motels, Inc., and Motor Hotels for the 1967 and 1968 taxable years were received by respondent on May 6, 1969. The reason given for this delay was Southland's involvement in litigation and other business matters. The Southland returns also indicated that no income taxes were due. Motor Hotels' return for the 1962*133 taxable year was received by the New Orleans district director 10 days after it was due. This return, as well as those for 1964 through 1966, showed no taxes due. Southland's returns for 1965 and 1966 showed no taxes due. Other than the explanation previously mentioned for the late filing of the 1967 and 1968 consolidated returns, petitioners gave no reasons for filing late returns for the years in issue. OPINION Issue 1. Net Operating Loss DeductionWhile in Chapter X reorganization, LeBaron claimed net operating losses of $80,896.01 and $23,853.50 for its fiscal years ended October 31, 1958 and 1959, respectively. After the acquisition by the Occhipinti group in October of 1959, LeBaron claimed a net operating loss carryover deduction for its fiscal year 1960.Respondent disallowed this deduction. Respondent's position is based upon the rationale of Willingham v. United States,289 F. 2d 283 (5th Cir. 1961), cert. denied 368 U.S. 828 (1961); and Libson Shops,Inc. v. Koehler,353 U.S. 382 (1957). LeBaron argues that the test of section 382(a) controls and, consequently, the Willingham and Libson Shops*134 holdings are inapplicable because they were decided under the Internal Revenue Code of 1939 which did not contain the provisions of section 382. This Court stated in Clarksdale Rubber Co. v. Commissioner,45 T.C. 2234, 42 (1965), that the "continuity of business enterprise" rule of Libson Shops applies to situations where two or more businesses combine and pre-merger losses are used to reduce post-merger income. We held that where the facts of a case are within the ambit of section 382, i.e., the change in ownership conditions of section 382(a)(1)(A) and (B) are met, then section 382(a)(1)(C) prevails over the Libson Shops test on the issue of whether "the same business" is thereafter carried on. Other courts have refused to apply the Libson Shops doctrine in cases governed by the 1954 Code. See Coast Quality Construction Corp. v. United States,463 F. 2d 503, 511 (5th Cir. 1972); United States v. Adkins-Phelps, Incorporated,400 F. 2d 737, 742 (8th Cir. 1968); Maxwell Hardware Company v. Commissioner,343 F. 2d 713, 716 (9th Cir. 1965). Respondent primarily relies on Willingham to support his*135 position. In Willingham, a net operating loss incurred prior to a Bankruptcy Act reorganization was not allowed to be carried over and offset post-bankruptcy income. The Court of Appeals denied the deduction because, except for the uninterrupted existence of the state charter, the post-bankruptcy corporation was a new business enterprise. As a result of the bankruptcy reorganization, the corporation's stock ownership and structure was changed and its debts were canceled. Willingham v. United States,supra at 286 and 287. The facts here are similar to those of Willingham. After its Chapter X reorganization, LeBaron was owned by new stockholders, new management acquired control of its operations and the outstanding debts of priority, secured and unsecured creditors were reduced and satisfied. However, as previously indicated, Willingham was decided under the 1939 Code. As in Clarksdale Rubber Co.,supra, the objective tests of section 382 clearly reach the facts of this case. Nevertheless, the respondent argues that section 382(a) does not apply because it merely disallows net operating loss deductions in special circumstances; it does*136 not grant a deduction. Furthermore, respondent contends that section 382(a) only applies to those reorganizations covered by section 381. Neither party contends that the reorganization involved in this case is within the terms of section 381. Respondent cites, as further support for his position, the earnings deficit cases 4 which involved railroad bankruptcies. These cases basically support the Willingham rationale, i.e., a formal Bankruptcy Act proceeding obliterates any net operating losses or earnings deficits because all debts are canceled. Once again, however, we emphasize that the enactment of section 382 requires special treatment of net operating losses as opposed to other tax attributes. 5*137 The cases cited by LeBaron in support of its reliance on section 382 do not involve insolvency reorganizations. 6 However, in Utah Bit & Steel, Inc. v. Commissioner,T.C. Memo. 1970-50, we tested a Bankruptcy Act reorganization under section 269 and then under section 382 rather than under the Libson Shops doctrine. In our opinion LeBaron, after the Chapter X reorganization, was the same entity as before the reorganization. Although a different stock ownership and management group controlled the corporation after the reorganization and it obtained a national franchise, the same business enterprise continued. We perceive no sound reason to treat a formal restructuring of debt through bankruptcy any differently than a contractual arrangement with creditors for the reduction of debts. 7 Any benefits from the resulting cancellation of debts can be mitigated by the application of section 1016. Section 1.1016-7, Income*138 Tax Regs.Accordingly, we hold that the question of whether the pre-bankruptcy net operating losses of LeBaron may be carried forward is governed by the provisions of section 382; and we further hold that LeBaron meets the requirements of that section. First, the Occhipinti group's ownership of LeBaron's outstanding stock was at least 50 percent greater in taxable year 1960 than in the previous taxable year.Sec. 382(a)(1)(A). Second, the business conducted by LeBaron after the bankruptcy reorganization was substantially the same as that conducted before the reorganization. Sec. 382(a)(1)(C). LeBaron's acquisition of a national franchise and change of management are within the guidelines of H. F. Ramsey Co. v. Commissioner,43 T.C. 500 (1965), and Goodwyn Crockery Co. v. Commissioner,37 T.C. 355 (1961), affd. 315 F. 2d 110 (6th Cir. 1963). LeBaron continued to serve the same type of customers in the same location, with about the same number of employees and the same buildings. *139 Pursuant to section 172 we hold that LeBaron is entitled to carry over its fiscal years 1958 and 1959 net operating losses to the fiscal year 1960. Respondent disallowed $60,660 of the $104,749.51 claimed by LeBaron as a net operating loss deduction for the fiscal year 1960. He claims that such amount represents capital expenditures rather than current business expenses. The following items are involved: Salary$32,500Financial Services23,200Appraisal Fees1,000Finders' Fees2,640Inspection Fee1,320Respondent argues that these costs are capital expenditures because they were incurred in the construction rather than the operation of LeBaron. To the contrary, LeBaron contends that these amounts were expended after the motel opened for business on May 17, 1958. We agree with respondent that LeBaron has failed to meet its burden of proof on this issue. The only witness called by LeBaron to establish the nature of these expenditures was unable to recall either their exact amount or the time period when they were incurred. As to salaries, the respondent allowed LeBaron a deduction totaling $12,676.50 for the period from July 15 to October 31, 1958. *140 This amount should be adjusted to include another two months because LeBaron began operations on May 17, 1958. Respondent's July 15th opening date is based on the date used in LeBaron's depreciation schedule. However, the report of the bankruptcy trustee indicates that LeBaron Motel opened for business on May 17, 1958. It logically follows from our holding on the net operating loss issue that LeBaron is the same taxpayer before and after the Chapter X reorganization. Therefore, by agreement of the parties, LeBaron is entitled to a deduction for the demolition of the swimming pool, kitchen, restaurant, and lounge of the motel in 1960. Further, the journal entries in LeBaron's accounting books indicate that this loss occurred in the fiscal year 1960, and not in the fiscal year 1961 as claimed by LeBaron. Finally, we agree with respondent that an adjustment in LeBaron's basis (not below fair market value) must be made to reflect the cancellation of indebtedness as a result of its discharge from bankruptcy. Section 1.1016-7(a), Income Tax Regs. However, the purchase price paid by the Occhipinti group is not fair market value. Section 1.1016-7(c), Income Tax Regs. Rather, a reasonable*141 estimate of LeBaron's fair market value as of the date of the confirmation of the plan of reorganization is $759,500. This sum represents a cash payment of $690,000 by the Occhipinti group to the trustee in bankruptcy plus $61,000 in the hands of the trustee and a pro rata amount of ad valorem taxes, deposits, prepaid insurance and accounts receivable for the unexpired part of 1959. The indebtedness of LeBaron was canceled in 1959. LeBaron contends that the fair market value of the property involved would be equal to, if not in excess of, the book value of the assets prior to the reorganization proceeding. In support of this contention, LeBaron refers to two appraisals--one in September 1963 and another in December 1964. LeBaron's assertion that the burden of proof regarding this issue is on respondent is erroneous. This issue was clearly raised in the notice of deficiency sent to petitioner wherein respondent adjusted the basis of the property involved. Therefore, the burden of proof is on LeBaron. Rule 142(a), Tax Court Rules of Practice and Procedure.Having the burden of proof on this issue, LeBaron was required to introduce evidence to establish the fair market*142 value of the property involved at the date of entry of the order confirming the reorganization plan under which the indebtedness was canceled.It failed to do so. Its reliance on the two appraisals referred to in its exception to determine fair market value in 1959 is unfounded. LeBaron has not clearly shown how these appraisals, which were made several years after the reorganization, are valid indicia of the fair market value of the property involved in 1959. Absent such evidence, LeBaron has failed to carry its burden of proving that the fair market value of the property involved is other than that which we have determined. Issue 2. Useful Lives of MotelsSection 167 allows the taxpayer a deduction for the exhaustion, wear and tear of property used in the trade or business. Section 1.167(a)-1(b), Income Tax Regs., provides four factors to be considered in making this determination: (1) wear and tear or decline from natural causes; (2) normal progress of economic changes and current developments in the trade or business; (3) local conditions peculiar to the trade or business; and (4) repair, renewal, and replacement policies. The reasonableness of the taxpayer's claim*143 for depreciation is determined upon the basis of conditions known at the end of each taxable year. The taxpayer must establish the reasonableness of the claim which can only be changed by clear and convincing evidence. Section 1.167(b)-0(a), Income Tax Regs. In proving the reasonableness of the depreciation deduction, the taxpayer cannot rely on facts unknown at the time the return is filed or on "hindsight evidence." Commissioner v. Mutual Fertilizer Co.,159 F. 2d 470 (5th Cir. 1947); Western Terminal Co. v. United States,412 F. 2d 826 (9th Cir. 1969); Johnson v. Commissioner,302 F. 2d 86 (4th Cir. 1962). However, the taxpayer may present evidence of post-return developments to show the importance of a particular factor in determining the useful life of an asset. Bradford, Inc. v. United States, an unreported case (D.C.Del. 1972), 30 AFTR2d 72-5504, 72-2 USTC par. 9671 (post-return evidence used to show the importance of interstate highways to a roadside motel). These are the guiding principles to be applied to the factual situation involved with respect to any depreciation deduction. The resolution of*144 the depreciation issue is factual, based on the evidence presented. Here the determination is particularly difficult. On the one hand, the record contains evidence which indicates that both motels initially were constructed of materials which were of average to good quality. They both were well situated and, although a new interstate highway was being proposed as early as 1958, there was no showing the proposal would materialize in the near future so as to render the motels economically obsolete.Further, the motels maintained a high occupancy rate for some time and the repairs and maintenance programs were adequate, although difficult in the New Orleans climate. As to the life expectancy of the motels in comparison to other motels in the Holiday Inn "chain" and throughout the industry, the useful lives determined by the respondent are less than those normally used. These facts, of course, support the position taken by the respondent.On the other hand, other facts in the record establish that at some point of time, Holiday Inn East began deteriorating more rapidly than anticipated. Indeed, Mr. Carney, a vice president of Holiday Inns, Inc., testified that it had failed to meet*145 minimum requirements on at least two occasions and had simply "worn out." In addition, the evidence shows that changing economic factors would materially shorten the useful lives of the motels, especially Holiday Inn West. The projected construction of the new interstate highway became more definite and traffic lessened. Occupancy rates declined materially. The franchise period of Holiday Inns was limited to twenty years; and the availability of mortgage money was limited to fifteen years. On the basis of the entire record, we think the respondent's determination of the useful lives of the buildings at Holiday Inns East and West for the years prior to the acquisition by the Poirier group in 1964 is correct. All the economic factors were not then well defined and most of the testimony regarding the deteriorating physical condition of the buildings concerns events which took place after the taxable years in controversy. However, the evidence shows that by 1964 the economic conditions had changed. The bypassing of the motels by the new interstate highway was imminent; and it was reasonable to conclude that this would adversely affect the economic useful lives of the buildings. *146 In addition, by 1964 it was known that Holiday Inn East was depreciating more rapidly than originally anticipated. Therefore, we hold that for the years 1964 and subsequent thereto, the useful lives for Holiday Inns East and West claimed by petitioners are reasonable. Zimmerman v. Commissioner,67 T.C. 94 (1976). Next, we must determine the useful life of the additional 62 units at Holiday Inn East which were opened in 1966. A vice president of Holiday Inns of America, Inc., called by the petitioners as an expert, testified that new motel units constructed shortly after the original buildings of a motel complex are depreciated over the remaining useful life of the original buildings.Respondent's policy is to depreciate such additional units according to their own useful life. In this instance, we think the respondent's approach is the better one since Holiday Inn East was not as badly situated as Holiday Inn West; and it is likely that the old units would be renovated. Consequently, we find a useful life of 18 years for the 62 new units at Holiday Inn East. Issue 3. Constructive OwnershipRespondent disallowed Southland's deductions for taxes, *147 interest, and depreciation attributable to the operation of Holiday Inns East and West. LeBaron and Jacqueline retained legal ownership of Holiday Inns East and West, respectively. Respondent allowed Southland rental expense deductions equivalent to the amounts claimed for taxes and interest with respect to the Jacqueline and LeBaron motel properties. The law is clear with respect to deductions for taxes and interest. Legal ownership of real property is a prerequisite to the deduction for taxes paid thereof. Evans v. Commissioner,42 B.T.A. 246, 255 (1940). Similarly, with regard to interest, a taxpayer is only entitled to deduct the interest incurred on his own obligations, not those of another. Koppers Co. v. Commissioner,8 T.C. 886, 889 (1947); Sheppard v. Commissioner,37 B.T.A. 279, 281 (1938). Therefore, we agree with respondent's allocation of these deductions among LeBaron, Jacqueline, and Southland. The resolution of the depreciation deduction is more difficult. The facts are undisputed. LeBaron is a corporation organized under the laws of Louisiana since November 27, 1957. LeBaron constructed the LeBaron Motel*148 which began operation in New Orleans on May 17, 1958. LeBaron was subsequently reorganized under Chapter X of the Bankruptcy Act. The Occhipinti group purchased the stock and assets of LeBaron through the reorganization and subsequently converted the LeBaron Motel into Holiday Inn East. Carbone-West No. 1 Hotel Builders, Inc. constructed a motel known as Holiday Inn West. Jacqueline subsequently purchased the land and improvements of Holiday Inn West. The Occhipinti group also owned the stock of Jacqueline. The Poirier group acquired the stock of Jacqueline and LeBaron from the Occhipinti group in April 1964 in exchange for cash, notes and assumed liabilities. In May 1964, Southland was incorporated. For all taxable years relating to this issue, legal title to Holiday Inns East and West was held by LeBaron and Jacqueline, respectively. The Poirier group were the principal stockholders of Southland. The parties agree that Southland did not have legal title to the land and improvements of Jacqueline and LeBaron. The allowance for depreciation is designed to permit a taxpayer who invests in a wasting asset a means of recouping, tax free, his investment in that property. *149 Currier v. Commissioner,51 T.C. 488, 492 (1968). To be entitled to depreciation under section 167, the taxpayer must have an investment in the property sought to be depreciated and the investment must be of such character as to give the taxpayer a depreciable interest in the property. Hunter v. Commissioner,46 T.C. 477, 489-490 (1966). Although ownership of the property is usually required, the existence of bare legal title in another does not always deprive the taxpayer of a depreciation deduction if it is shown that the taxpayer, in fact, is the one who suffers the economic loss of his investment by virtue of the wear and tear or exhaustion of the property. Currier v. Commissioner,51 T.C. at 490. Capital investment rather than legal title is the determining factor as to whether a taxpayer is entitled to depreciation. This view is consistent with Helvering v. Lazarus & Co.,308 U.S. 252 (1939), where the Supreme Court said at page 254: While it may more often be that he who is both owner and user bears the burden of wear and exhaustion of business property in the nature of capital, one who is not the owner*150 may nevertheless bear the burden of exhaustion of capital investment. Where it has been shown that a lessee using property in a trade or business must incur the loss resulting from depreciation of capital he has invested, the lessee has been held entitled to the statutory deduction. [Emphasis supplied.] Respondent established that Southland did not make any capital investment in the property legally owned by LeBaron and Jacqueline. Since Southland made no capital investment in such property, it follows that it had no basis for depreciation in such property. Consequently, in determining its basis for depreciation of property legally owned by LeBaron and Jacqueline, Southland is not entitled to carryover the aggregate adjusted basis for depreciation of such property on the books of LeBaron and Jacqueline. Southland contends that, although it did not claim a step-up in basis on the acquisition of LeBaron and Jacqueline, a stepped-up basis should be allowed to it because the Poirier group purchased the stock in order to obtain the assets. Kimbell-Diamond Milling Co. v. Commissioner,14 T.C. 74 (1950), affd. 187 F. 2d 718 (5th Cir. 1951),*151 cert. denied 342 U.S. 827 (1951). Respondent argues that the Kimbell-Diamond doctrine requires a liquidation after the purchase of the stock, a distribution of the assets to the shareholders, and a contribution of the assets to another corporation. Although the Poirier group drafted a plan of liquidation of LeBaron and Jacqueline, the plan was not carried out. However, petitioners claim that a defacto liquidation occurred. We disagree with petitioners. After the acquisition by the Poirier group, LeBaron and Jacqueline conducted sufficient activities to remain active business entities. First, LeBaron and Jacqueline undertook mortgagor liabilities on the mortgage loan to refinance the motel properties. Second, both corporations reserved the motel properties as assets in order to pay contingent liabilities. Third, both corporations joined in the lawsuit against Holiday Inns of America to enjoin the cancellation of the Holiday Inn West franchise. These activities are sufficient to negative the defacto liquidation argument. Rev. Rul. 74-462, 1974-2 C.B. 82, 83. For these reasons, we conclude that Southland is not entitled to a stepped-up*152 basis for the depreciation of Holiday Inns East and West. Issue 4. Consolidated ReturnsRespondent disallowed Southland, Motels, Inc., and Motor Hotels' consolidated returns for the fiscal years 1967 and 1968 because of their failure to follow the technical requirements of section 1.1502, Income Tax Regs. Respondent argues that Motor Hotels has failed to prove that it is a member of an affiliated group according to section 1504.Petitioners contend that despite their failure to follow the technical requirements of the regulations, the consent of Motels, Inc. and Motor Hotels to the filing of a consolidated return with Southland is clear from the facts. We find it unnecessary to resolve this issue on the basis of compliance with technical requirements because we agree with respondent that petitioners have not proved that they are affiliated corporations. 8 Section 1501 allows an affiliated group of corporations to file a consolidated return. Section 1.1502-1(a), Income Tax Regs., defines a "group" as one qualifying under the provisions of section 1504. Section 1504 defines an "affiliated group" as a chain of corporations connected through stock ownership with a common*153 parent if: (1) Stock possessing at least 80 percent of the voting power of all classes of stock and at least 80 percent of each class of the nonvoting stock of each of the includible corporations (except the common parent corporation) is owned directly by one or more of the other includible corporations; and (2) The common parent corporation owns directly stock possessing at least 80 percent of the voting power of all classes of stock and at least 80 percent of each class of the nonvoting stock of at least one of the other includible corporations. According to petitioners' brief, and the record is unclear on this point, the Poirier group owns the stock of all three corporations. Common ownership is not sufficient to meet the statutory test. Petitioners' theory of constructive ownership cannot be accepted in light of this clear statutory language.Petitioners have*154 cited no authority for this position. The facts here are not the same as in Rev. Rul. 69-591, 1969-2 C.B. 171, because there the parent corporation owned and incorporated the subsidiaries and simply failed to issue stock certificates. Here, by contrast, there is only common stock ownership of the three corporations. Consequently, we sustain respondent on this issue. Respondent also disallowed Southland's claim of a full surtax exemption for the 1967 and 1968 fiscal years. He claims that Southland is a member of a controlled group within the meaning of section 1563(a)(2) and, therefore, is ineligible for the full surtax exemption. Section 1561(a). We disagree with respondent. While his determination is correct under section 1563(a)(2) as it now stands, the law was different in 1967 and 1968. In 1969, Congress changed the definition of a brother-sister controlled group from 80 percent stock ownership by one person to 80 percent stock ownership by five or fewer persons. As no one member of the Poirier group owned 80 percent or more of the stock of Southland, Motels, Inc., and Motor Hotels in 1967 and 1968, we hold that Southland is entitled to a full surtax*155 exemption for those years. Issue 5. Delinquency and Negligence PenaltiesRespondent determined additions to tax under section 6651(a) against LeBaron for the years 1960 through 1964, against Jacqueline for the years 1959, 1960, 1963, and 1964, against Southland for the years 1965 through 1968, and against Motor Hotels for the years 1962, 1964, 1965, and 1966, because of their failure to file timely income tax returns. Respondent asserts that petitioners' failure to file was due to willful neglect and was without reasonable cause. Petitioners have the burden of proving that there was reasonable cause for their failure to file timely returns. Bebb v. Commissioner,36 T.C. 170, 173 (1961).Except for Southland's consolidated returns for 1967 and 1968, petitioners offered no reasonable cause for the delay. The fact that no income tax liability was reported does not prevent respondent's penalty determinations. Section 6651(a)(1) provides for a delinquency penalty on the "amount required to be shown as tax." Therefore, respondent's determinations are correct with respect to those items decided in his favor. If no tax is due for a particular taxable year,*156 then no delinquency penalty can be imposed. Harris v. Commissioner,51 T.C. 980, 987 (1969). Southland's explanation for the untimely filing of its 1967 and 1968 consolidated returns cannot be accepted as reasonable cause. The fact that its president was busy with other corporate matters is not sufficient cause for the long delay involved here. Dustin v. Commissioner,53 T.C. 491, 501 (1969), affd. 467 F. 2d 47 (9th Cir. 1972). Petitioners also have the burden of proving that respondent's determination of section 6653(a) negligence penalties against LeBaron (1961 through 1964), Jacqueline (1959 through 1964), and Motor Hotels (1959 through 1966) were incorrect. Reily v. Commissioner,53 T.C. 8 (1969). Since Motor Hotels introduced no evidence on this issue, respondent's determination of additions to tax under section 6653(a) is sustained. However, with respect to LeBaron and Jacqueline, the record shows that the deductions were taken in good faith and raise substantial issues of law and fact. Scott v. Commissioner,61 T.C. 654 (1974). Therefore, respondent's determinations of negligence penalties*157 against LeBaron and Jacqueline are not sustained. * * *To reflect the concessions of the parties and our conclusions on the disputed issues, Decisions will be entered under Rule 155. Footnotes1. The LeBaron Corporation, docket No. 4708-65; Motor Hotels of Louisiana, Inc., docket No. 5701-65; Jacqueline, Inc., docket No. 1560-66; Motor Hotels of Louisiana, Inc., docket No. 3731-66; The LeBaron Corporation, docket No. 4596-66; Jacqueline, Inc., docket No. 512-67; Southland Inns, Inc., docket No. 2201-70; Motor Hotels of Louisiana, Inc., docket No. 2304-70; The LeBaron Corporation, docket No. 2305-70; Jacqueline, Inc., docket No. 2306-70; and Southland Inns, Inc., docket No. 5231-70 have been consolidated for purposes of trial, briefs, and opinion.↩2. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, unless otherwise indicated.↩3. Motels, Inc. is a corporation owned by the Poirier group. It operated Holiday Inn East.↩4. Dunning v. United States,353 F. 2d 940 (8th Cir. 1965), cert. denied 384 U.S. 986 (1966); United States v. Kavanagh,308 F. 2d 824 (8th Cir. 1962); McCullough v. United States,344 F. 2d 383 (Ct. Cl. 1965), cert. denied 382 U.S. 901 (1965); Banister v. United States,236 F. Supp. 972↩ (E.D. Mo. 1964). 5. Respondent acknowledges that Willingham involved years (1952 and 1953) prior to the enactment of the 1954 Code, but points out that it was decided in 1961, some 7 years after the adoption of section 382. He also points out that the Court of Appeals for the Fifth Circuit made no comment regarding the effect section 382 may have had on the decision rendered in that case. Hence, respondent asserts that since an appeal in this case will be in the Fifth Circuit, the Tax Court is bound to follow the law of that circuit. See Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F. 2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). We disagree with respondent as to application of Golsen because of the change in law and because we do not regard Willingham↩ as being "squarely in point."6. Maxwell Hardware Company v. Commissioner,343 F. 2d 713 (9th Cir. 1965); Clarksdale Rubber Co. v. Commissioner,45 T.C. 234 (1965); H. F. Ramsey Co. v. Commissioner,43 T.C. 500↩ (1965).7. Tillinghast & Gardner, Acquisitive Reorganizations and Chapters X and XI of the Bankruptcy Act,26 Tax L. Rev. 663, 718↩ (1971).8. Petitioners' assertion that the burden of proof with respect to this issue is on the respondent is incorrect. The notice of deficiency dated June 5, 1970, notified Southland that it was not entitled to file a consolidated return with Motor Hotels. Thus, petitioners have the burden of proof on this issue.↩